George LUNDQUIST, Appellant,

v.

Jean LUNDQUIST, Appellee.

No. S–6761.

Supreme Court of Alaska.

Aug. 16, 1996.

Allan Beiswenger, Robinson, Beiswenger & Ehrhardt, Kenai, for Appellant.

Linn J. Plous, Kenai, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

### I. INTRODUCTION

This appeal is from a judgment dividing property in a divorce proceeding. George Lundquist disputes the trial court's determinations as to the character, value, and proper distribution of the marital property. We affirm in part and reverse in part.

### II. FACTS AND PROCEEDINGS

George Lundquist has worked as a commercial fisherman in Alaska since the 1960s. He has held a limited entry permit[1] for drift net fishing in the upper Cook Inlet. In 1985 George's fishing boat sank near Kodiak Island. In March 1986, George purchased a new fishing vessel, the F/V Koosh-da-kaa. The purchase price for the F/V Koosh-da-kaa was $95,000; George paid $25,000 in cash, $20,000 of which represented the insurance proceeds from the sinking of his old vessel. George financed the balance with a promissory note in the amount of $70,000. Title was in George's name alone.

According to George, he and Jean Lundquist began living together in March 1987 when they rented an apartment and opened a joint bank account. Jean claims that they started living together in April 1986. George and Jean were married in Reno, Nevada, on February 7, 1988. It was George's second and Jean's fifth marriage. At the time, George was forty-nine years old. Jean was forty-three years old and had worked as a bartender.

George and Jean purchased a residence, built a shop on the premises, and directed money into various investment and retirement accounts. They used marital funds to lengthen the F/V Koosh-da-kaa.

In 1987 the Glacier Bay spilled oil in Cook Inlet, and George received a settlement payment for damages sustained as a result of that spill. In 1989, the Exxon Valdez oil spill prevented George from fishing for salmon in the Cook Inlet. He received a partial payment from Exxon for lost income as a result of that spill. George also participated in a lawsuit against Exxon, seeking damages for lost income from fishing for 1989 and 1990, as well as punitive damages.

In 1990 George purchased a motor home. According to George, the purchase was paid for with the proceeds of the Glacier Bay oil spill settlement. Jean was aware that George had received funds from the Glacier Bay spill but was unsure where those funds went. Although she was uncertain about what funds were used to purchase the motor home, she contended that it was most likely purchased with the proceeds from the Exxon Valdez oil spill. Title to the motor home was

---

1. In 1973, Alaska initiated a program to limit commercial fishing. *See* AS 16.43.010. Under the system, only holders of limited entry permits may engage in commercial fishing in particular fisheries. *See* AS 16.43.140. Such permits are transferable, subject to certain substantive and procedural requirements. *See* AS 16.43.170.

held jointly, and Jean contends that joint funds were used to purchase it.

When George's mother, Frieda Eklund, died in 1990, George was named executor of her estate. Eklund's will left George her interest in a checking account. The remainder of the estate was to be divided between George, his daughter Laura, and his niece Suzanne Lundquist. Apparently Suzanne removed substantial funds from Eklund's checking account prior to her death. According to George, he and Jean went to California, and Jean assisted him by going through the checks to determine how much Suzanne had taken. On June 25, 1992, George received a check for $64,000 from his mother's estate. He deposited the check into his "separate" account,[2] and issued his daughter a check for $22,710, representing her share of the estate. George then paid Jean $1,000 for her work on the estate. George retained approximately $40,000 that remained in his separate account.

Jean tells a somewhat different version of the events surrounding the death of George's mother. She claims that George asked her to assist him in the probate proceedings and promised her that anything she got out of the estate would be hers.

George and Jean separated in August 1992 when Jean moved out. Both parties sought an interim award of occupancy of the marital residence. Judge Cranston entered an order granting George the right to live in the marital home. George claimed that a number of items of his personal property had been removed from the house by Jean.

At trial, Jean conceded that George's limited entry permit was his pre-marital property but claimed that the F/V Koosh-da-kaa was a marital asset. George argued that because part of the boat was paid for with the insurance proceeds and the rest with money derived from the limited entry permit, the boat was his separate property. Both parties agree that the house was a marital asset. Jean valued the house and shop building at $125,000. George valued the house and shop at $115,000. Jean claimed that the inheritance from George's mother should be treated as marital property. The parties disagreed about who was responsible for the items missing from the residence.

After trial, Judge Cranston asked for annotated arguments from counsel. The court then entered its Findings of Fact, Conclusions of Law, and Order. It found the value of marital property to be $379,855. The court found that the F/V Koosh-da-kaa, the inheritance, the several bank and retirement accounts, the damage awards from the Glacier Bay and Exxon Valdez oil spills, and the motor home were marital assets. The court divided the property on a 50–50 basis, awarding George the F/V Koosh-da-kaa, his Capital Construction account, his inheritance, and other marital funds in his separate checking account. Jean was awarded the investment accounts, the marital residence, and the motor home. The court found that a piece of property George owned in Whittier was partially marital and partially separate. The court also found that Jean should be held responsible for the missing items of George's personal property.

Based on George's motion for clarification or reconsideration of several aspects of the court's decision, the court entered an order changing the date of the parties' marriage from February 1987 to February 1988 and the initial loan amount on the F/V Koosh-da-kaa from $75,000 to $70,000. The court denied the remainder of George's motion. George appeals.

On appeal George disputes the trial court's characterization of the F/V Koosh-da-kaa, motor home, inheritance, and Exxon Valdez damages as marital property. He also finds fault with the trial court's valuation of the marital residence, Whittier parcel, his separate checking account, and his fishing gear. Finally, he takes issue with the trial court's 50–50 distribution of the marital assets.

## III. DISCUSSION

### A. Standard of Review

■ Property division in Alaska consists of three steps: determining what property is

---

2. George maintained a separate bank account at National Bank of Alaska for business and personal use. He deposited marital fishing income into the account as well as the inheritance. The account was used to pay marital debts, fishing expenses, and back taxes.

available for distribution, placing a value on that property, and allocating the property equitably. *Moffitt v. Moffitt*, 749 P.2d 343, 346 (Alaska 1988); *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

### B. Did the Trial Court Err in Its Characterization of the Property?

The first step in any property division is determining what property will be divided. The trial court determines what property is marital. *Moffitt*, 749 P.2d at 346. The available property will include all assets acquired during marriage.[3] *Rhodes v. Rhodes*, 867 P.2d 802, 804 (Alaska 1994). If the parties by their actions demonstrate an intent to treat any separate property as a marital holding, it must also be treated as marital property. *Id.; Chotiner v. Chotiner*, 829 P.2d 829, 832 n. 4 (Alaska 1992); *Wanberg*, 664 P.2d at 571. Once the trial court determines that the property was treated as a marital holding, it may not refuse to treat the property as marital and distribute it. *Wanberg*, 664 P.2d at 571; *Compton v. Compton*, 902 P.2d 805, 812 (Alaska 1995); *Lowdermilk v. Lowdermilk*, 825 P.2d 874, 878 (Alaska 1992).

The trial court's characterization of property as marital or separate is reviewed for an abuse of discretion. *See Jones v. Jones*, 835 P.2d 1173, 1175 (Alaska 1992); *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991). However, when the trial court makes a legal determination in the course of carrying out this step, that determination is reviewed *de novo*. *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994); *Moffitt*, 749 P.2d at 346.

### 1. Characterization of the F/V Koosh-da-kaa

George bought the F/V Koosh-da-kaa for $95,000, putting $25,000 down and executing a note for the balance of the purchase price. At the time of the parties' marriage, George owed $60,094 towards the purchase of the F/V Koosh-da-kaa. When the parties separated, the principal balance was $36,106. The value of the vessel at the time of the divorce was $80,000. The trial court found

that the equity in the F/V Koosh-da-kaa was $43,893. The trial court then determined that the F/V Koosh-da-kaa was marital property.

Jean presented evidence of the parties' intent to treat the F/V Koosh-da-kaa as marital property. Jean testified that she took an active role in the fishing venture and contributed substantial efforts towards it. She detailed her contributions as "working on the boat, working on the fishing gear, frequent grocery shopping and cooking for the crew, going out on the boat and working as a deck hand, tending to the business needs of the enterprise while George was out fishing, and helping to pay for the boat by contributing to the growing equity in the Koosh–Da–Kaa."

Jean further argues that the parties always referred to the fishing business as "our business" and agreed that whatever they acquired during marriage would be marital property. Further, the improvements to the boat were paid for with marital funds.

Marital funds were used to pay off a substantial portion of the loan on the F/V Koosh-da-kaa, as well as to fund a major capital improvement. Jean presented evidence that she made substantial contributions to the fishing enterprise and the operation of the F/V Koosh-da-kaa. While George disputed Jean's version of events, the trial court apparently gave more weight to her testimony than to his. Based on these facts, it was not an abuse of discretion for the trial court to characterize the F/V Koosh-da-kaa as marital property.

### 2. Characterization of the motor home

On January 10, 1990, George executed a purchase order for a 1978 Sportcoach 33' motor home for a price of $21,200. The registration lists George and Jean as the owners. George claims that he paid for the motor home with the proceeds of the Glacier Bay oil spill settlement and that those funds were his separate property. Jean claims that the funds came from joint funds and that even if Glacier Bay proceeds were used, those funds were marital. Jean also argues

---

**3.** There are exceptions to this rule. For example, a spouse's inheritance is not usually considered to be marital property. *Julsen v. Julsen*, 741 P.2d 642, 648 (Alaska 1987).

that because the asset was acquired during marriage, it is marital regardless of the source under AS 25.24.160(a)(4).

■ While holding joint title is not determinative of intent· to treat property as a marital holding, it does create "rebuttable evidence that the owner intended the property to be marital." *Cox,* 882 P.2d at 916, citing *Chotiner,* 829 P.2d at 833. Jean presented evidence that could have allowed the trial court to conclude that marital funds were used to purchase the motor home and that she and George made significant improvements to the motor home during their marriage. Based on this evidence, it was not an abuse of discretion for the court to characterize the motor home as marital property.

### 3. *Whittier real property*

In 1974, George purchased a parcel of property in Whittier for $7,100. George made monthly payments of $47 on the property, and in 1986, he owed $5,289 on it. At trial, George said that he did not know the value of the property, but that the last appraisal or assessment valued it at $9,000. Jean's post-trial proposed property division accepted George's $9,000 value.

The trial court found that the Whittier property was partially marital and partially separate. It found the value of the marital property to be $7,100 and the marital equity to be $4,500. The record reveals no rational basis for these conclusions.

■ First, it was error for the trial court to characterize the property as partially marital and partially separate. As we

noted recently in *Compton v. Compton,* 902 P.2d 805 (Alaska 1995), "the entire equity in a piece of joint property should be allocated." *Id.* at 812.[4] Property that at first glance appears to be separate, because it was originally acquired outside of the period of coverture or because it was purchased with separate funds, will be characterized as a marital holding if the parties demonstrate an intent to treat it as such.[5] For example, in *Chotiner,* we held that joint ownership, substantial efforts at joint management, maintenance, or improvement of the property, or written or oral agreements, were all factors that could lead a court to conclude that the parties intended to treat a piece of property as a marital holding. *Chotiner,* 829 P.2d at 833. Additionally, in *Rhodes,* we held that the assumption of joint and several liability for debt on a vessel and the use of marital funds to pay that debt justified finding intent to treat the vessel as marital property. *Rhodes,* 867 P.2d at 805.

Because the trial court applied the incorrect legal standard in dividing this piece of property, a remand is necessary for the trial court to determine if the Whittier property is marital. In addition, we note that the trial court may need to take additional evidence to determine the equity in the property, should it find that the property is in fact marital.

### 4. *Characterization of the inheritance*

■ As of August 31, 1992, George's bank account at National Bank of Alaska had a balance of $116,878. Of this, George contends that approximately $40,700 was an inheritance from his mother's estate, which

4. There are exceptions to this rule. For instance, we have routinely affirmed trial court decisions that divided pensions, retirement accounts, and stocks or other capital, into marital and separate portions. *See Wainwright v. Wainwright,* 888 P.2d 762, 763 (Alaska 1995) (finding pension partially marital and partially separate); *Chotiner,* 829 P.2d at 832 (finding annuity both marital and separate based on how much earned during marriage); *Lowdermilk,* 825 P.2d at 877 (holding increase in assets of husband's premarital business during marriage marital, but otherwise business separate); *Bandow v. Bandow,* 794 P.2d 1346, 1348–49 (Alaska 1990) (holding annuity given as payment for tort damages could be partially marital and partially separate); *Lewis v. Lewis,* 785 P.2d 550, 556 (Alaska 1990) (finding

portion of contingent stock interest earned during marriage was marital property); *Brooks v. Brooks,* 733 P.2d 1044, 1053–54 (Alaska 1987) (finding active appreciation in separate asset is marital property).

Additionally, in *Bandow* we established that compensatory damage awards may be divided into marital and separate portions. *See Bandow,* 794 P.2d at 1350.

5. Such property, although marital, may be divided in a manner different from the other marital property of the parties in recognition of the contribution of one of the parties. Brett R. Turner, *Equitable Distribution of Property,* § 8.05 at 566 (2d ed. 1994).

should have been considered to be his separate property. The trial court found that these funds were marital property.

George, when asked at trial if he had told Jean she would be entitled to a share of the inheritance, answered:

No. No, I never said this. Everything we done was—she was my wife. It was supposed to be mutual. I never told her this, no.

Later he elaborated by stating:

I assumed this was to be mutual. I did not tell her that this would be hers. That's what I meant. . . .

. . . .

Well, whatever we gleaned during our marriage should have been [both of ours].

George also testified that the inheritance was in fact his separate property.

The trial court found:

On or about June 25, 1992 Husband received $64,000.00 from his mother's estate. The parties, through their efforts, discovered the named executor had fraudulently obtained the estate's money. Wife claims her efforts resulted in payments back to the estate. Husband, though claiming that he paid Wife $1,000.00 for her efforts on behalf of the estate, also testified he intended any funds received as an inheritance to be marital. The Court finds that the proceeds of the Eklund estate paid to Husband, amounting to $40,700.00 constitute marital property.

■ George's statements that he assumed that the proceeds of the inheritance would be "mutual" are nothing more than a restatement of the general proposition that property acquired during marriage is presumptively marital property. *Rhodes*, 867 P.2d at 804. But a strong exception to this rule exists for inheritances. We have held that

an inheritance received by one spouse during marriage is not property acquired during coverture within the meaning of AS 25.24.160(a)(4), but constitutes a non-mari-

tal asset of the inheriting spouse. As such, an inheritance will not be subject to distribution unless a balancing of the equities requires it.

*Julsen*, 741 P.2d at 648 (footnote omitted).

George received the inheritance check less than two months prior to the time of separation. Although he paid Jean $1,000 for her help in going through the checking records to discover that money had been removed improperly, he took no actions upon receipt of the money to treat it as marital property. While the trial court based its decision on George's subjective "intent" that he and Jean share what they received during the marriage, George's testimony that he assumed that all property received during the marriage should be shared is not sufficient to overcome the strong presumption that an inheritance is separate property.[6] It was an abuse of discretion for the court to characterize the inheritance as marital property.

### 5. *The Exxon Valdez damages*

George was one of a large number of plaintiffs who sued Exxon over the Exxon Valdez oil spill. George received a payment of $34,766 from Exxon in 1989 in partial payment of compensatory damages. In addition, George is one of 10,000–15,000 plaintiffs who have won a portion of a $5 billion award of punitive damages from Exxon. George argues that all of these monies are his separate property; Jean argues that they are all marital.

#### a. *Compensatory damages*

■ George contends that the Exxon damages came to him solely as a result of his status as a holder of a limited entry permit, which both parties agree is George's separate pre-marital property. Additionally, George claims that part of the Exxon award was actually for the devaluation of his limited entry permit.

■ In Alaska, a tort recovery is classified according to what it is intended to replace. *Bandow*, 794 P.2d at 1348. *Bandow*

---

**6.** Jean's testimony that George promised to give her *all* of the money she helped to recover was not mentioned in the trial court's findings nor

does it appear to be the basis of the court's decision on this issue.

provides the rule for how to characterize awards of compensatory damages. When an award "compensates for losses to the marital estate it is marital property. To the extent the recovery compensates for losses to a spouse's separate estate, it is his or her separate property." *Id.*

George testified at trial that he received the payment from Exxon because he was not able to fish for salmon in the Upper Cook Inlet in 1989. George also admitted that permit holders who had never fished before would not have received the same payment. George never testified that the payment was intended to compensate him for any devaluation of the permit. Thus no evidence was presented to the trial court to demonstrate that the compensatory damages were for devaluation of the limited entry permit. The evidence presented indicates that the award replaced lost fishing income during a period when the parties were married. Because the award replaced income that would have been marital, the entire compensatory damages award is marital under *Bandow*.

The trial court was correct in its characterization of the compensatory damages George collected from Exxon as marital property.

#### b. *Punitive damages*

George also expects to receive punitive damages from the Exxon Valdez oil spill. The trial court held that "[t]he Court finds no difference between the character of the award, whether punitive or otherwise" and classified the punitive damages as marital property. George argues that just as damages for noneconomic injuries result from "fortuitous circumstances," so do punitive damages. *See id.* at 1350. He thus concludes that punitive damages are separate property. George also claims he is entitled to the punitive damages as a result of his holding a limited entry permit since 1973.

■ Our decision in *Bandow* does not directly control this case because punitive damages are not compensation for personal or pecuniary losses. *Barber v. National Bank of Alaska*, 815 P.2d 857, 864 (Alaska 1991). Punitive damages are awarded for the impact they have on the wrongdoer, not the wrongfully injured party. We are not aware of any relevant decisions that address the issue of characterization of punitive damages in property division cases.[7]

■ We decline to adopt George's proposed rule that punitive damages are always the separate property of the spouse receiving them. While punitive damages are not acquired by the joint efforts of the parties in the same sense that wages or property are, they are paid to persons who have suffered compensable injury. Because there is a link between the payment of compensatory and punitive damages,[8] in cases where the underlying compensatory damages would be marital property, it would be improper to award all of the punitive damages as separate property.

We also reject a bright-line rule that all punitive damages recovered during marriage are marital property. Such a rule would be easy to apply and in accord with the general

---

**7.** Two cases have raised the issue of division of punitive damages without actually deciding the question. *See Mears v. Mears*, 305 S.C. 150, 406 S.E.2d 376, 380 (App.1991), *aff'd*, 308 S.C. 196, 417 S.E.2d 574 (1992), *overruled by Marsh v. Marsh*, 313 S.C. 42, 437 S.E.2d 34 (1993) and *Amie v. Amie*, 106 Nev. 541, 796 P.2d 233, 234 (1990). One Texas case, *Rosenbaum v. Texas Bldg. & Mortgage Co.*, 140 Tex. 325, 167 S.W.2d 506, 508 (Com.App.1943), dealt with the question, but that case occurred before Texas recognized that at least some tort recoveries received during marriage could be separate property. *See* Scott A. Hennis, *Punitive Damages: Community Property, Separate Property, or Both*, 14 Community Prop. J. 51 (1987).

**8.** When evaluating the appropriateness of a punitive damages award, among the factors we examine are "the magnitude and flagrancy of the offense, the importance of the policy violated, and the defendant's wealth." *Cameron v. Beard*, 864 P.2d 538, 551 (Alaska 1993) (citing *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 205 (Alaska 1980)). Another relevant factor is the ratio of the compensatory damages to the punitive damages. *Ben Lomond, Inc. v. Campbell*, 691 P.2d 1042, 1048 (Alaska 1984) (quoting *Clary Ins.*, 620 P.2d at 205). With the exception of the question of the defendant's wealth, all of these factors relate in some manner to the harm that was visited upon the victim. This reinforces our view that it is proper to distribute a punitive damages award in the same manner as the underlying compensatory damages award.

rule that all property acquired during coverture is marital property. *See* AS 25.24.160(a)(4). One commentator has suggested that because punitive damages can be viewed as a "bounty" for bringing an action against a wrongdoer, they could properly be characterized as marital property. Kirk H. Nakamura, *The Classification of Personal Injury Damages Under California Community Property Law: Proposals for Application and Reform*, 14 Pac. L.J. 973, 996 (1983).

However, punitive damages are not received as a result of the parties' joint efforts in the same sense that marital income is. *See Portwood v. Copper Valley Elec. Ass'n, Inc.*, 785 P.2d 541, 543 (Alaska 1990) (stating punitive damages intended to punish defendant not compensate victim); Hennis, *supra* note 6, at 54 (noting punitive damages generally recognized as windfall to plaintiff); W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 2, at 9 (5th ed. 1984) (punitive damages punish defendant and are "over and above" full compensation). The fact that inheritances are not received as a result of the parties' joint efforts was one of the reasons we found that inheritances are not marital property. *Julsen*, 741 P.2d at 648. The commentator we cited in that case wrote that "[i]f property is acquired without the joint efforts of the parties such property arguably should not be subject to division." *Id.* (citing Lawrence J. Golden, *Equitable Distribution of Property* § 5.19, at 113 (1983)). We concluded that "our view of equitable distribution in general, ... recognizes the partnership theory of marriage and considers the mutual effort and tangible contributions of the parties rather than the mere existence of the marital relationship." *Julsen*, 741 P.2d at 648.

Characterizing all punitive damages as marital property could be inequitable. If one party to the marriage is wrongfully injured, and under *Bandow* all of the damages for that injury are classified as separate property, we see no reason why it would be proper to characterize any punitive damages awarded as marital property. We believe that adopting a rule that punitive damages are always marital suffers from the same failings as the mechanistic approach to classification of compensatory awards that we rejected in *Bandow*.

■ The rule we adopt today is that punitive damages can be partially marital and partially separate, or even entirely one or the other, depending on the facts. An award of punitive damages should be apportioned in the same manner as the underlying compensatory damages award. *See* Hennis, *supra* note 6, at 55. Under Alaska law, the *Bandow* determination of what proportion of the compensatory damages are marital would also determine the proportion of the punitive damages that are marital.

We believe that this method of apportioning punitive damages in property divisions is the most equitable. Because the underlying compensatory damages award in this case was properly characterized as marital property, the punitive damages award was also properly characterized as entirely marital property. The trial court's characterization of the punitive damages as marital property was not error.

## C. Did the Trial Court Err in Its Valuation of the Marital Property?

■ The second step of a property division is the valuation of the marital property. *Wanberg*, 664 P.2d at 570. The trial court's determinations of the value of property are factual decisions that will be reversed only if clearly erroneous. *Doyle*, 815 P.2d at 368; *Cox*, 882 P.2d at 913–14.

### 1. House equity

■ At trial, Jean testified that the fair market value of the marital residence was $105,000 and that the shop building's value was $20,000, for a total of $125,000. George testified that the house and shop together were worth $115,000. The trial court valued the property at $115,000. George now argues that the trial court's determination was erroneous. His basis for this argument is apparently that the trial court's findings of fact mistakenly state that Jean valued the property at $105,000 while George valued it as $125,000. Appellant speculates that the trial court reached its $115,000 valuation

through the process of averaging the erroneous amounts.

It is difficult to understand the basis of George's appeal of this valuation. The trial court valued the property at precisely the $115,000 estimated by George at trial. Since the trial court's valuation of the house was supported by George's testimony, it was not an abuse of discretion.

## 2. *NBA account*

George's account at National Bank of Alaska was also allocated as a marital asset by the court. This is the same account into which he deposited the inheritance he received from his mother. On June 25, 1992, George deposited $64,000 in proceeds from his mother's estate into this account. On July 10, 1992, he wrote a check for $22,710 to his daughter, representing her share of the estate. This left the balance of the account as of July 31, 1992, at $40,687. On August 4, 1992, George deposited $25,900 into the account. On August 31, 1992, he deposited an additional $50,000 into the account. There seems to be no dispute that these additional deposits represented fishing proceeds. As of August 31, 1992, the date of the parties' separation, the account balance was $116,878.

After the parties' separation, George made payments of $16,125 to his deck hand for work performed during the 1992 fishing season, $15,763 for the loan on the F/V Koosh-da-kaa, and $27,085 for back taxes to the IRS. He also paid marital debts accrued on charge cards and revolving accounts of $14,707. The trial court found that most payments made from the account were for marital debts, marital business, or were related to George's mother's estate. The court further found that "two payments from the account directly related to husband's commercial fishing activity, the boat payment and the crew share payment."

In her post-trial proposed asset distribution, Jean argued that it was unfair for George to claim deductions for all of the expenses he paid from the account. This is because George charged his fishing expenses for the entire year against the account, while only his fishing income deposited in August 1992 was included in the property division. The trial court apparently took this concern to heart and attempted to fashion a formula to account for the payments out of the account which could be attributed to post-marital fishing expenses.[9] The trial court devised the following formula:

> The court will allow deductions from the account in the ratio of the balance of the account as of separation over the total fishing income for 1992, 0.83. The boat payment deduction is $13,083.00 and the crew share deduction is $13,384.00. The Court finds that the funds received as Husband's share of his mother's estate are marital property, (see Finding 28). Based on the foregoing analysis, the Court finds that $25,910.00 of the monies in the NBA account as of the date of separation represent marital funds.

George argues that he should have been allowed full credit for all payments from the account, and that he was "double-charged" for his inheritance.

There are several problems with the trial court's approach. First, there is no evidence in the briefs or the trial court's decision that indicates whether any fishing income was earned after the parties' separation.[10] Second, even assuming that George earned fishing income after separation, and it was thus his separate property, the 83% ratio could bear no relationship to it, since there is no evidence of any breakdown of marital and post-marital income. If the trial court did believe that the expenses George paid from the account prior to separation were for the entire fishing season, including a portion of

---

**9.** The trial court seems to have viewed this as a "recapture" issue. When marital assets are spent for non-marital purposes subsequent to the parties' separation "the court can 'recapture' the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset." *Foster v. Foster,* 883 P.2d 397, 400 (Alaska 1994).

**10.** Further, assuming that George did earn post-separation fishing income for 1992, there is no evidence that the $16,125 payment to the deck hand was related to the production of post-separation 1992 fishing income.

the season after the date of separation, it could properly have taken that into account and added back into the account that portion of crew shares that were paid for the crew's work after separation. However, the formula employed by the trial court does not achieve this result.

■ Additionally, it appears that the trial court's formula is inconsistent with other portions of its decision. In assessing what portion of the payments on the F/V Koosh-da-kaa were made during the parties' marriage, the court took into account the full amount of the payments made in 1992. Thus, the $15,763 payment was counted as fully marital by the trial court in characterizing the F/V Koosh-da-kaa as marital property. By contrast, the court counted only $13,083 of the payment as an appropriate payment of marital debt. The trial court must reconcile this inconsistency.

■ Finally, George claims that the 0.83 ratio results in his being credited twice for the inheritance. The court awarded George $25,910, representing its determination of the marital portion of the NBA account after the court-allowed expenses. This figure, as we noted above, included the fishing income deposited into the account, as well as the inheritance, less deductions for payments of marital debts. The court then separately assigned to George's column of assets the $40,700 inheritance; thus, George was credited twice with the receipt of the inheritance.

The trial court abused its discretion in valuing the NBA account. On remand, the court should make detailed findings about its basis for valuing the account. Furthermore, based on our decision that the inheritance was not marital property, the court shall characterize $40,700 of the NBA account as George's separate property.

### 3. *Fishing gear*

■ The trial court's detailed listing of the personal property assigns to George's fishing gear a value of $2,500. In her post-trial proposed distribution, Jean valued the gear at $5,000, while George gave it a value

of zero, claiming that the gear was included within the appraised value of the F/V Koosh-da-kaa and that most of it was pre-marital.

■ The trial court is required to state the basis for its findings of value. *See Johnson v. Johnson,* 836 P.2d 930, 933 (Alaska 1992) (holding trial court must make sufficiently detailed findings to allow Supreme Court to understand basis of decision). When, for example, the parties obtain divergent appraisals of a piece of property, it may be appropriate to average those valuations. However, a blanket policy of averaging divergent values encourages parties to submit the most extreme values they can imagine, knowing that the court will simply average the two figures. In this case, an average of the two figures has no rational basis. Jean's valuation was dependent on the fact that the fishing gear was not included in the appraisal of the boat, while George's was based on the fact that the gear was included within the appraised value. Although the trial court need not accept either party's valuation of the gear, it must have a rational basis for the value it chooses. The trial court abused its discretion in valuing the fishing gear.

### D. *Did the Trial Court Err in Making an Equitable Distribution of the Property?*

■ The final step in the property division process is determining if an equitable distribution of the property is possible.[11] The trial court's decision on the equitable allocation of the property is reviewed under an abuse of discretion standard, and will be reversed only if clearly unjust. *Cox,* 882 P.2d at 914; *Doyle,* 815 P.2d at 368.

■ In this case, the trial court divided the property on a 50–50 basis. The law presumes that a 50–50 split of marital property is equitable. *Carlson v. Carlson,* 722 P.2d 222, 225 (Alaska 1986). George claims that the trial court should have explicitly considered the *Merrill* factors in determining the appropriate division of property. Jean points out that the court's findings, when read in their entirety, demonstrate that the

---

11. It is in this final step that the trial court applies the *Merrill* factors. *See* AS 25.24.160(a)(4) and *Merrill v. Merrill,* 368 P.2d 546, 548 n. 4 (Alaska 1962).

court considered many factors, including the details of the purchase of the F/V Koosh-da-kaa, the marital residence, and the parties' ability to maintain the residence.

We find no error in the trial court's 50–50 property division.

## IV. CONCLUSION

The trial court's characterization and valuation of the Whittier property, characterization of the inheritance, and valuation of the NBA account and fishing gear are REVERSED and REMANDED for further proceedings consistent with this opinion. The remainder of the trial court's determinations are AFFIRMED.