Tarie S. LACHER, Appellant,

v.

Louis R. LACHER, Jr., Appellee.

No. S–8441.

Supreme Court of Alaska.

Dec. 10, 1999.

William T. Ford, Anchorage, for Appellant.

Jill K. Dean, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I.  *INTRODUCTION*

In April 1992 Louis R. (Bob) and Tarie Lacher filed for dissolution of marriage and entered into a property settlement agreement that was incorporated into their dissolution decree.  The parties agreed that Tarie would receive the marital home and the majority of the parties' other property.  Several months later, the parties reconciled and continued to live together, unmarried, for over two more years.  In June 1996 Bob moved to set aside the original dissolution decree, requesting that the court redistribute the marital and post-dissolution property.  He

claimed that he and Tarie had never physically or financially separated and that they had omitted numerous marital assets from the original agreement.

The trial court granted Bob's motion and held a trial on the property issues, awarding Bob the marital home and other property originally awarded to Tarie. The court also imputed income to Tarie for the purpose of calculating child support. Tarie appeals the trial court's decision to set aside the divorce decree, its division of property, and its child support determination.

While the trial court properly granted Bob's motion to set aside the original property settlement agreement, it erred in its determination and division of marital assets and its calculation of child support. Accordingly, we reverse.

## II. FACTS AND PROCEEDINGS

Bob and Tarie Lacher married in April 1982. Bob worked as a building contractor for his own corporation, L.R. Lacher, Inc., earning approximately $56,000 a year. Although she worked part-time as a secretary for Lacher, Inc., earning $15,600 a year, Tarie was primarily a homemaker. When they petitioned for dissolution of their marriage in January 1992, they had a daughter, Kelly, and Tarie was pregnant with their second child, Marshall, who was born in August 1992.

Although they differ on the details, the Lachers agree that a primary motive for the original dissolution was to protect their assets from Bob's potential creditor, Nye Ford. In January 1992 Nye Ford sued Bob; Bob and Tarie filed for dissolution the same month. Bob testified that "we were both worried about how much it might cost me to defend myself ... [and] I wanted to be sure that if I had to fight for two years to clear my name, my kids would have a place to live." He also stated that he and Tarie were not "getting along very well" and that she had a boyfriend. Although she claims not to have supported the tactic of divorcing to protect their assets, Tarie agreed that the threat of Nye's lawsuit prompted the original

discussion of dissolution. Tarie claims that Bob promised to remarry her as soon as the Nye lawsuit ended.

When they filed their dissolution petition, Bob and Tarie entered an agreement on custody and visitation, child support, and distribution of marital property. The parties agreed to award custody of Kelly to Tarie and liberal visitation to Bob. The agreement required Bob to pay $768 a month in child support for Kelly, increasing to $1,037 a month once the baby was born, and $500 a month in spousal support "until the children are school age and the mother is retrained and earning at least [$]40,000 a year from employment."

Tarie received the marital home, located next to Bob's mother's home, and an undeveloped lot. Bob received a thirty-nine percent interest in Alaska First Venture, a commercial building co-owned by Bob's parents, and a one-third interest in Bob and Tarie's two homes in Palmer. Each party assumed the liability for his or her respective real properties. According to the agreement's personal property division, Bob took $102,440 of Lacher, Inc. stock including property described as the Snodgrass lots valued at $49,500, while giving Tarie a promissory note for $46,660 for her share; Tarie received a Ford truck worth $8,500; and Bob and Tarie split a $26,000 certificate of deposit, twenty-five percent to Bob and seventy-five percent to Tarie. They also divided their Lacher, Inc. retirement account, with seventy-eight percent to Bob and twenty-two percent to Tarie. Superior Court Judge Beverly W. Cutler incorporated Bob and Tarie's agreement into the dissolution decree, finding that the parties had satisfied the statutory requirements [1] and that the agreement was just.

Several months later, Bob and Tarie resumed living together in the marital home. The parties agree that "there was no attempt ... to divide their assets, debts, income, expenses, [or] any aspect of the financial relationship" until June 1995, two years after the dissolution. Tarie wrote checks from the Lacher, Inc. corporate account to deposit in their joint personal account in order to pay

---

1. See AS 25.24.160(a)(2) & (4); AS 25.24.200(a).

Bob and Tarie's joint bills, including house payments and improvements to the house and other properties. The parties even used the $46,660 promissory note awarded to Tarie in the dissolution decree to lower Lacher, Inc.'s tax liability in 1993[2] and to purchase a $10,000 airplane.[3] The parties also jointly spent $16,000 of the $26,000 certificate of deposit awarded to Tarie upon dissolution. Because of their cohabitation and commingling of funds, Bob never paid child or spousal support. The parties then had a third child, Amy, in February 1994.

Sometime between June 1994 and June 1995, the parties separated again. Bob claimed that the parties physically and financially separated in June 1994. During that month, Tarie was locked behind prison bars with inmates during a fire alarm while she was employed at the Palmer Correctional Center. This experience triggered a psychotic episode. On July 12, 1994, Tarie's family petitioned for Tarie's involuntary commitment for psychiatric evaluation and treatment. Dr. James F. Harper assessed Tarie in October 1994 and found that "she may have suffered an acute psychotic episode marked by paranoid ideation/delusional beliefs, and that she seemed to be largely in remission." Tarie agrees that Bob moved out of the marital home in July 1994 because of her mental illness. Because of Tarie's state of mind, Bob also petitioned for custody of their youngest daughter[4] and moved to modify custody of the two older daughters on July 14. But Tarie claims that she and Bob continued a romantic and sexual relationship until June 1995. They ultimately stipulated to a June 1995 date of economic separation.

In February 1995 Tarie sued the state for sexual harassment that she claimed to have experienced while working at the Palmer Correctional Center. Tarie settled the case in December 1995 and received a net recovery of approximately $50,000. She attests that $5,000 of the settlement was for lost wages and that $45,000 was for her pain and suffering.

In March 1996 the parties finally settled the child custody issue. They modified their dissolution decree to provide for joint legal custody and shared physical custody, with the children living with each parent during alternating weeks. They agreed that child support obligations should be set in accordance with Alaska Civil Rule 90.3.

Three months later, Bob moved to modify the dissolution decree, requesting that it be set aside pursuant to Alaska Civil Rule 60(b)(6).[5] He claimed that the property distribution omitted a number of items of marital property, including a $10,000 boat, a $19,700 airplane, a $25,000 marital interest in the fifty-seven acre Fairview Loop property,[6] a $9,200 lakefront property, and the parties' $10,000 individual retirement accounts. Tarie opposed this motion, maintaining that "[t]his is a case in which there is both an enforceable dissolution agreement *and* a domestic partnership pursuant to which joint personal property must be divided." She listed the post-dissolution property as the Subaru and Saab, floats for the airplane, their joint accounts, and household furniture.

On September 17, 1996, Superior Court Judge pro tem Peter G. Ashman set aside the property distribution in the dissolution decree based on Civil Rule 60(b). He found that the property distribution was "woefully

---

2. Bob claims that he eventually paid $18,000 in taxes from his separate post-June 1995 earnings because of an audit and his and Tarie's joint decision to write off her note in this manner. The superior court acknowledged the tax debt in its findings of fact.

3. Bob does not dispute that the parties used Tarie's note for this purpose.

4. The superior court consolidated this petition for Amy's custody with the original dissolution proceedings.

5. Alaska Civil Rule 60(b) provides:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
. . . .
(6) any other reason justifying relief from the operation of the judgment.

6. The parties later stipulated to a value of $45,600 for the Fairview Loop property, but the record does not clearly indicate whether this amount was the value of the entire property or only the marital half.

inadequate" and that the parties never evidenced an intent to dissolve the marriage. The court then set a November 4, 1996 trial date for resolution of the property issues and the parties agreed to this date.

At an October 16 pre-trial conference and hearing on child support issues, Tarie requested a continuance of trial because she was attempting to hire a new attorney and because necessary appraisals had not yet been performed. The court agreed to grant a continuance of the pre-trial conference but denied the continuance for trial, instructing Tarie to tell her new attorney that the court would not grant any more continuances.

Yet on October 25 Tarie's substituted counsel moved to continue the trial. At the continued pre-trial conference hearing four days later, the trial court again denied the trial continuance, commenting that the case had been in the court for almost two years and that the court had "begged and pleaded" with the parties to reach some type of settlement.

Tarie then requested that Judge Ashman recuse himself because of his involvement in her psychiatric commitment proceedings and his failure to allow her sufficient time to prepare for the trial in the pre-trial order. Judge Ashman declined to recuse himself.

Prior to trial, Bob submitted a proposed distribution of the property. At trial, Tarie requested at least an eighty percent interest in the marital estate and stated that a fair settlement would be "[t]hat I retain ... the marital house, and at least $30,000.00 in cash so I can pay off the debt owed on the house."

After a four-day trial, Judge Ashman redistributed the property, adopting Bob's proposed distribution in all respects. The superior court awarded Bob the marital home and the Ford truck, while Tarie received the note on the Palmer houses and the Lacher, Inc. assets, which included the Subaru and Snodgrass lots. Of the assets that Bob claimed were omitted, the court awarded Bob the airplane and his own retirement account, while Tarie received the boat and the Fairview Loop property. In determining child support, the court imputed income of $20,000 in wages to Tarie because it found that she was voluntarily underemployed.

Tarie appeals the trial court's decision to grant the Rule 60(b)(6) motion to set aside the original dissolution decree, its redistribution of the property, its denial of her motion to continue the trial, its ruling on the petition for recusal, and the amount of income imputed to her in the trial court's calculation of child support.

### III. DISCUSSION

**A. The Trial Court Properly Granted Bob's Motion to Modify the Original Dissolution Decree's Property Distribution.**

■■■■ Tarie contends that the trial court erred when it set aside the property distribution contained in the dissolution decree under Alaska Civil Rule 60(b)(6).[7] Because Bob and Tarie's divorce decree incorporated their property settlement agreement, the property division is a final judgment.[8]

■■■■ But Alaska Civil Rule 60(b) authorizes a court to set aside a final judgment that is unjust.[9] Rule 60(b)(6) provides that a

---

**7.** We will not disturb a trial court's ruling on a Rule 60(b)(6) motion unless there was an abuse of discretion and we are "left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *McGee v. McGee,* 974 P.2d 983, 987 (Alaska 1999) (citation omitted). But "whether the trial court applied the appropriate legal standard in exercising its broad discretion is a question of law regarding which this court may substitute its independent judgment on appeal." *Lowe v. Lowe,* 817 P.2d 453, 456–57 (Alaska 1991) (citation omitted).

**8.** *See O'Link v. O'Link,* 632 P.2d 225, 228 (Alaska 1981).

**9.** *See Lowe,* 817 P.2d at 456. Alaska Civil Rule 60(b) articulates several grounds by which the court may set aside a final judgment:

(1) mistake, inadvertence, surprise or excusable neglect;

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or

court may relieve a party from a final judgment for "any other reason justifying relief from the operation of the judgment" as long as the party moves for relief "within a reasonable time." A party can invoke subsection (b)(6) only if none of the other five clauses apply and "extraordinary circumstances" exist: [10]

> In general, relief is given under clause (6) in cases in which the judgment was obtained by the improper conduct of the party in whose favor it was rendered or the judgment resulted from the excusable default of the party against whom it was directed under circumstances going beyond the earlier clauses of the rule....
>
> ... The broad power granted by clause (6) is not for the purpose of relieving a party from free, calculated, and deliberate choices he has made. A party remains under a duty to take legal steps to protect his own interests.[11]

We have articulated four factors that may constitute extraordinary circumstances sufficient to set aside a property division in a final divorce decree under Rule 60(b)(6): "(1) the fundamental, underlying assumption of the dissolution agreement had been destroyed; (2) the parties' property division was poorly thought out; (3) the property division was reached without the benefit of counsel; and (4) the [property in dispute] was the parties' principal asset." [12] Because these factors merely serve as equitable factors for the court to consider, each factor need not be present in order for the court to properly grant Rule 60(b)(6) relief.[13]

In support of the trial court's decision to grant the Rule 60(b)(6) motion, Bob first maintains that the underlying assumption of the parties that he and Tarie would continue to live together and share the marital assets had been destroyed. He relies on *Foster v. Foster*,[14] in which the parties assumed at the time of the divorce that they would continue living as a family unit after the final dissolution decree. With this understanding, the parties in *Foster* agreed to a property settlement that awarded the wife a one-half interest in the marital home upon sale but gave the husband sole discretion as to when it would be sold. The parties later ceased living together. Because the underlying assumption of the property agreement was destroyed, we concluded that modification of the original decree to provide for immediate payment to the wife for her share of the marital home was appropriate.[15]

But the underlying assumption in this case is not so clear. At the time of dissolution, Bob and Tarie agreed that the primary motive in dissolving their marriage was to protect their assets from Nye Ford's lawsuit against Bob.[16] But the evidence does not indicate whether they intended to continue to live together after the dissolution. Bob testified that he and Tarie were having problems at the time of dissolution because Tarie had a boyfriend. On the other hand, Tarie claims that Bob promised to remarry her as soon as the Nye lawsuit ended. The trial court made no finding as to Bob and Tarie's underlying assumption at the time of their dissolution or how it had been destroyed.

But the trial court's alternative basis for its decision to reopen the property division—that the parties omitted several marital assets from the dissolution agreement—provides independent support for the trial court's decision. Here, the trial court granted Bob's motion to set aside the property distribution in part because the division was "woefully incomplete." Indeed, the property

---

otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

    (6) any other reason justifying relief from the operation of the judgment.

**10.** *O'Link,* 632 P.2d at 229.

**11.** *Id.* at 229–30 (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2864 (1973) (footnotes omitted)).

**12.** *Schofield v. Schofield,* 777 P.2d 197, 202 (Alaska 1989).

**13.** *See Clauson v. Clauson,* 831 P.2d 1257, 1260–61 (Alaska 1992).

**14.** 684 P.2d 869 (Alaska 1984).

**15.** *See id.*

**16.** We condemn such an obvious misuse of the dissolution process.

agreement incorporated in the divorce decree allocated approximately $250,000 of the marital estate but did not include all of the parties' marital assets. The parties dispute the total sum of the omitted assets: Bob claims that the omitted assets total over $100,000 while Tarie asserts that the assets total $60,-000. In either event, the trial court correctly granted the Rule 60(b)(6) motion to set aside the decree because the original property division failed to dispose of substantial items of marital property.[17]

### B. *The Trial Court Properly Denied Tarie's Motions to Continue the Trial.*

Once the trial court reopened the property distribution, Tarie twice moved to continue the trial, but the trial judge denied both motions.[18] Tarie appeals the denials of her motions to continue the trial because she "had to try the case on very short notice with new counsel."

Tarie maintains that she was prejudiced because neither her initial attorney nor her subsequent counsel could have effectively prepared for a trial on the property issues on such short notice. Specifically, she claims that because she had "virtually no warning" that the court would redistribute the property, she did not have time to obtain the necessary appraisals in preparation for trial. We disagree.

In *Siggelkow v. Siggelkow*,[19] we expressly observed that late retention of counsel does not necessarily warrant a continuance:

[W]hen new counsel is engaged just prior to the trial date, the alleged lack of preparation on the part of such counsel is not

necessarily a ground for continuance; ... If the rule were otherwise, one or the other of the litigants could indefinitely avoid trial of the issues by making late substitutions.[20]

Shortly before trial, Tarie elected to change attorneys. The trial court warned her that her decision to hire a new attorney would not entitle her to a continuance of trial. She secured new counsel on October 18, leaving her replacement attorney three weeks to prepare for trial. Despite this short notice, Tarie concedes that "[her] new counsel did an adequate job of presenting evidence."

Furthermore, Tarie had adequate time to obtain appraisals. Judge Ashman set aside the property distribution in the divorce decree on September 20, approximately six weeks before the trial. At that time, Bob's attorney mentioned in court that "some appraisals needed to be done." The parties ultimately stipulated to many of the property values before trial. Where no stipulation was entered, the parties presented testimony or relied on earlier valuations of the property. In light of these circumstances, the trial court did not abuse its discretion in denying the motions to continue.

### C. *The Trial Judge Did Not Err in Refusing to Recuse Himself.*

Tarie argues that Judge Ashman should have recused himself from this case because he had been extensively involved in the proceedings for Tarie's involuntary commitment to psychiatric care and in the settlement conferences and litigation leading to the divorce trial.[21] Here, Tarie states in her brief that she did not suspect any bias by

---

17. See *Schofield*, 777 P.2d at 202.

18. We review such denials for an abuse of discretion. See *Mack v. Mack*, 816 P.2d 197, 198 (Alaska 1991). A trial court has abused its discretion when a party has been "deprived of a substantial right or seriously prejudiced by the lower court's ruling." *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989) (citation omitted). We examine the particular facts and circumstances of each case to make this determination. See *Siggelkow v. Siggelkow*, 643 P.2d 985, 987 (Alaska 1982).

19. 643 P.2d 985 (Alaska 1982).

20. *Id.* at 987 (citations and internal quotation marks omitted) (first alteration in original).

21. We will reverse a judge's refusal to disqualify himself only if "patently unreasonable," *Long v. Long*, 816 P.2d 145, 156 (Alaska 1991) (citation and internal quotation marks omitted), or if "a fair-minded person could not rationally come to [the same] conclusion on the basis of known facts." *Id.* (quoting *Blake v. Gilbert*, 702 P.2d 631, 642 (Alaska 1985)) (alteration in original). Where only the appearance of impartiality is involved, we require the petitioner to make a "greater showing" for reversal. *Id.* (citation and internal quotation marks omitted). We assess all the facts and circumstances to determine wheth-

Judge Ashman against her until *"after* he had rendered his decision setting aside the property division without making any particular findings or explaining his reasoning for doing so." But this argument is little more than an expression of Tarie's dissatisfaction with the superior court's ruling. The trial court's decision did not "demonstrate any specific bias or generalized pattern of bias."[22]

Tarie also questions the trial court's basis for finding that her relationship with Bob's mother was strained. She asserts that because the parties presented no evidence of any animosity between Bob's mother and Tarie, Judge Ashman thus must have improperly considered information from outside sources in deciding to award the marital home to Bob. But the evidence at the trial on property issues supported the trial court's observation of animosity between Tarie and her mother-in-law. While Bob's mother did not testify on this issue, Tarie did concede that problems had arisen over the years in her relationship with her mother-in-law. Bob also testified to "bad blood" between Tarie and his mother. Thus, Judge Ashman's finding on this issue does not evidence bias or improper consideration of facts outside of the record at trial. We affirm his decision not to recuse himself.[23]

**D.** *The Trial Court Erred in Dividing the Property upon Redistribution.*

 ▇▇▇▇ We now turn to the trial court's valuation and division of Bob and Tarie's

marital property in its modification order.[24] "Property division in Alaska consists of three steps: determining what property is available for distribution, placing a value on that property, and allocating the property equitably."[25]

*1. Characterization of property*

▇▇▇▇ When dividing property between divorcing parties, the trial court must distribute all assets acquired during marriage.[26] The proper date for distinguishing marital from post-marital assets is the date "when the marriage has terminated as a joint enterprise" or "when a married couple cease functioning economically as a single unit."[27] Although assets acquired by an unmarried couple during a period of cohabitation are distributed according to a different method[28] and the parties in this case were no longer married after their 1992 dissolution, they stipulated to a June 1995 date of economic separation and agreed that the trial court should consider as marital property all assets accumulated as of that date.

▇▇▇▇ Tarie challenges the trial court's characterization of certain items of property as marital. Tarie first argues that the trial court should not have classified the entire Fairview Loop property as a marital asset because Bob's mother, Barbara Lacher, owned half of that property. Prior to dissolution, Bob purchased a one-half interest in

---

er "an abuse of sound judicial discretion occurred." *Id.* (citation omitted).

**22.** *Id.* (quoting *Alaska Trams Corp. v. Alaska Elec. Light & Power,* 743 P.2d 350, 353 n. 7 (Alaska 1987)).

**23.** Judge Cutler also independently reviewed the case pursuant to AS 22.20.020(c), which provides for review of a judge's decision not to recuse him or herself, and denied the motion for disqualification of Judge Ashman.

**24.** A trial court's determination of what property is available for distribution may involve both legal and factual questions. *See McGee v. McGee,* 974 P.2d 983, 987 (Alaska 1999). We review legal questions de novo and factual findings for clear error. *See id.* We reverse a trial court's determinations of the value of property only if clearly erroneous. *See Lundquist v. Lund-*

*quist,* 923 P.2d 42, 51 (Alaska 1996). Finally, we reverse a trial court's decision on the equitable allocation of property only if clearly unjust. *See id.* at 53.

**25.** *Lundquist,* 923 P.2d at 46–47.

**26.** *See id.* at 47.

**27.** *Hatten v. Hatten,* 917 P.2d 667, 671 (Alaska 1996) (citing *Hanlon v. Hanlon,* 871 P.2d 229, 231 (Alaska 1994)).

**28.** In *Wood v. Collins,* 812 P.2d 951 (Alaska 1991), we explained the proper approach for distributing property accumulated during a non-marital cohabitation period, concluding that a court must determine the express or implied intent of the parties with respect to each item of property. *See id.* at 956.

the Fairview Loop property with marital funds. Because he used joint funds, the one-half interest was indeed marital property.[29] Bob testified that after the dissolution, he transferred the parties' interest in the property to his mother but that she agreed to transfer the entire property back to him to help settle the lawsuit. Upon redistribution, the trial court awarded to Tarie the value of the entire Fairview Loop property, "including the one half of the value owned by ... the mother of the petitioner." But Bob's mother's one-half interest in the property was never marital property and thus was not available for distribution. Moreover, forcing Tarie to take unwanted non-marital property belonging to a third party in lieu of the cash or other marital property necessary to achieve an equitable distribution unfairly benefits Bob. Thus, the trial court erred in including Bob's mother's interest in the Fairview Loop property in its distribution of marital property.

■ Tarie next contends that the trial court erred in considering her entire settlement as marital property. Although both the sexual harassment of which Tarie complained and the filing of her lawsuit occurred during the period that she and Bob were living together and functioning as an economic unit, we agree with Tarie that the entire settlement should not necessarily be classified as marital property.

■ In *Bandow v. Bandow,*[30] we concluded that "the purpose for which the [tort] recovery is received controls its classification."[31] If the recovery compensates for losses to the marital estate, the settlement proceeds should be classified as marital property.[32] But to the extent the recovery compensates for "lost post-marital earning, post-marital medical expenses, and [her] pain and suffering (both during and after marriage)," the award should be classified as her separate property.[33]

Tarie testified that only $5,000 of the settlement was to compensate for lost earnings while the remaining $45,000 was for her personal pain and suffering. Bob presented no controverting evidence. Accordingly, only $5,000 qualifies as a marital asset available for distribution.

Moreover, Tarie claims that by the time of trial, the settlement proceeds had been spent on such expenses as child care, clothes for the children, food, house maintenance, and utility expenses, as well as attorney's fees. Thus, the marital portion of the settlement proceeds may have been expended for the benefit of both Bob and Tarie by the time of trial and thus would be unavailable for division. On remand, the trial court should determine whether the $5,000 marital portion of Tarie's settlement remained available for distribution.

### 2. Valuation of property

■ Tarie also challenges the trial court's valuation of the marital home, the Snodgrass lots included in the Lacher, Inc. assets, and the marital portion of the Fairview Loop property. First, Tarie disputes the trial court's valuation of the marital home at $126,000, when the parties stipulated to a value of $136,200 at trial. In fact, Bob did stipulate to a fair market value of $170,000 for the home and a mortgage of $33,800. The trial court did not give any reasons for arriving at a fair market value for the marital home of $126,000, rather than the agreed upon $136,200. Thus, the trial court's valuation of the home was clearly erroneous.

■ Second, Tarie contends that the Snodgrass lots have a value of $23,000–$25,000, rather than the trial court's determined value of $49,500. While her expert testified that the lots might take a year or longer to sell unless reduced to $23,000–$25,000, Tarie's expert also calculated a fair market value of $49,000 at the time of trial. Bob's expert similarly stated that the fair market value

**29.** *See* AS 25.24.160(a)(4); *Rhodes v. Rhodes,* 867 P.2d 802, 804 (Alaska 1994).

**30.** 794 P.2d 1346 (Alaska 1990).

**31.** *Id.* at 1348.

**32.** *See Hatten v. Hatten,* 917 P.2d 667, 672 (Alaska 1996).

**33.** *Bandow,* 794 P.2d at 1347.

was \$49,500. Given that both experts' current valuations of the lots support the court's valuation, the trial court's valuation of the Snodgrass lots at \$49,500 was not clearly erroneous.

Third, Tarie maintains that the trial court erred in valuing the Fairview Loop property at \$91,200. While Tarie admits that her attorney stipulated to a value of \$45,600, she asserts that this amount represents the value of the entire property, not just the marital one-half interest. In fact, Bob did take inconsistent positions on this issue: In his motion to set aside the dissolution decree, he estimated the value of the parties' partial interest in the Fairview Loop property to be \$25,000, but at trial, he maintained that the stipulated value of \$45,600 applied to that one-half marital interest rather than the entire property. The stipulation of property values filed by the parties before trial did not specify whether \$45,600 represented the partial or full value of the Fairview Loop property. Because of this discrepancy and the trial court's failure to resolve it, the trial court must reconsider its valuation of the marital portion of the Fairview Loop property on remand.

### 3. *Equitable distribution*

Relying on the parties' educational backgrounds and relative financial situations, the court awarded the marital home to Bob and other valuable properties to Tarie, resulting in a 60/40 final distribution in Tarie's favor. Tarie argues that the distribution is inequitable, primarily because the trial court did not award her the marital home and instead required her to take the entire Fairview Loop property.

The trial court based its decision to award the home to Bob on Tarie's strained relations with her former mother-in-law, who lives next door. Concerned that placing Tarie and Bob's mother in close proximity could cause problems for the children, it reasoned that it could not "in [good] conscience even consider awarding the family home to [Tarie]" because of her poor relationship with her former in-laws and that its award of the entire Fairview Loop property to Tarie was "the only way to balance the issue of the home." Because we have reversed the award of the entire Fairview Loop property to Tarie and have identified other errors in the identification and valuation of property, the trial court will need to adjust its overall distribution of property. Given its concerns about the poor relationship between Tarie and her former mother-in-law, the trial court may wish to reconsider awarding Tarie the marital interest in the Fairview Loop property, because to do so would place Tarie and Bob's mother in co-ownerhip.

### E. *The Trial Court Erred in Calculating the Child Support Obligation.*

Tarie contends that the trial court erred in imputing a \$20,000 income to Tarie.[34] Here, noting Tarie's past work earnings and her college degree, the trial court found that Tarie was voluntarily underemployed and that she could earn \$11 an hour, approximately \$22,800 a year, if she chose to take available work. Moreover, Tarie's counsel stated in her closing argument that with Tarie's skills and work experience, Tarie could earn from \$10–\$12 an hour. Thus, the trial court's imputation of a \$20,000 wage income is not clearly erroneous.

But the trial court also included \$2,000 of interest from Tarie's \$50,000 settlement proceeds in its calculation of Tarie's income. If, as Tarie contends, the lawsuit proceeds had been exhausted by the time of trial, they are no longer available to generate interest income. If this is the case, the court erred in including \$2,000 of interest income in its determination of adjusted income for child support purposes. As a result, we remand so that the court may determine whether

---

34. A trial court's determination of imputed income is a factual finding that we review under the clearly erroneous standard. *See Dunn v. Dunn*, 952 P.2d 268, 270 (Alaska 1998). A trial court may determine a parent's potential income when calculating child support if the parent is voluntarily underemployed. *See* Alaska R. Civ. P. 90.3 cmt. III.C. The court should consider "the parent's work history, qualifications, and job opportunities." *Id.*

Tarie is receiving this interest income and recalculate the child support obligation as necessary.[35]

## IV. CONCLUSION

We conclude that the trial court properly granted the Rule 60(b)(6) motion to set aside the divorce decree in order to allocate the omitted assets. Because Tarie's late retention of counsel and failure to secure appraisals did not justify a continuance, we conclude that the trial court correctly denied those motions. Moreover, we conclude that Judge Ashman properly refused to recuse himself because Tarie's claim of bias by Judge Ashman is unfounded. Accordingly, we AFFIRM each of these rulings.

But the trial court improperly considered Bob's mother's interest in the Fairview Loop property and the entire amount of the lawsuit proceeds as marital property. The court also erred in its valuation of the marital home and failed to resolve conflicts in the value of the Fairview Loop property. Thus, we REMAND to the trial court to reassess and redistribute the marital assets. Finally, we conclude that the trial court correctly imputed $20,000 in income to Tarie but may have erred in including $2,000 of interest from the lawsuit proceeds in its calculation. Thus, we REMAND on that limited issue as well.

---

**35.** Tarie also claims that the trial court made no findings with respect to Bob's salary or ability to pay child support. But, in accordance with the parties' agreement on custody and support, the court ruled that child support would be set pursuant to Alaska Civil Rule 90.3 and instructed the parties to file child support guidelines affidavits with the court. Bob filed such an affidavit with the court, and Tarie stipulated to it. Tarie cannot now argue that the court erred when it made no findings on Bob's child support obligation.