# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

————————————————

No. 1D18-40

————————————————

MARY GRACE VINSON,

    Appellant/Cross-Appellee,

v.

TOMMY JUNIOR VINSON,

    Appellee/Cross-Appellant.

————————————————

On appeal from the Circuit Court for Okaloosa County.
Michael A. Flowers, Judge.

January 7, 2019

ON MOTION FOR REHEARING

JAY, J.

We deny the former wife's Pro Se Motion for Rehearing. We withdraw our earlier opinion, however, and substitute the following corrected opinion in its place.

Before us are the former wife's appeal, the former husband's cross-appeal from the Amended Final Judgment of Dissolution of Marriage, and the orders properly subsumed therein. *See* Fla. R. App. P. 9.110(h). After giving due consideration to all of the arguments raised by each party, we affirm the points raised on appeal, but reverse in part the points raised on cross-appeal. As a

result—and for the reasons discussed below—we remand the cause for further proceedings.

## I. FACTS

There are few dissolution cases that reach this Court having taken the straight and narrow path. Likewise, in the present case, the parties met pitfalls and took detours of their own device prior to reaching the final hearing. We take note of the trial court's commendable efforts to shepherd them toward that end. But in order to fairly and accurately recount the hazards they encountered along the way requires that we include the following, relatively lengthy, recitation of the facts.

### A.

The parties were married on February 14, 2007. Their daughter was born in 2012. The parties separated in December 2014, and six months later, on June 1, 2015, the former wife filed her Petition for Dissolution of Marriage. On January 15, 2016, following a hearing, the trial court entered a Stipulated Temporary Order adopting the parties' stipulated temporary time-sharing agreement concerning their minor child. The stipulated order established an equal time-sharing arrangement between the parties and obligated the former husband to pay temporary child support.

A final hearing was scheduled on the former wife's petition on October 5, 2016. In the meantime, on September 26, the former wife and her attorney—Wanda Morgan—arrived at the law offices of the former husband's attorney with the intent of taking the former husband's deposition. Instead, the parties entered into a new time-sharing agreement that departed markedly from the equal time-sharing plan approved by the trial court in the Stipulated Temporary Order.

Specifically, Ms. Morgan announced that they had "worked out the time sharing in this case, that the husband [would] have majority time sharing with the parties' minor child," and the former wife "[would] get all of the summer []—which will begin one week after school lets out and it will end when—one week before school reconvenes." In addition, the parties would "alternate the

2

entire Thanksgiving holiday . . . [and] [would] split the Christmas Holiday according to [the] Okaloosa Shared Parenting Plan." Furthermore, the former wife would get "every three or four day weekend," which they anticipated would amount to one weekend per month, "whether it be due to a teacher work day or holiday like Labor Day, Memorial Day, [P]resident's Day . . . ." Lastly, the former wife would pay "$200 a month to the husband as child support." Ms. Morgan represented that they would "reserve" on the remainder of the assets, including the marital home, until the upcoming October hearing.

Next, the court reporter—who had been retained to report the former husband's deposition—placed the former wife under oath. Ms. Morgan asked the former wife if she understood the time-sharing arrangement as it was outlined by Ms. Morgan. The former wife replied, "Yes," and then added, "Yeah, I just want to know about the social security that he can get[.]" After informing the former wife that they would eventually get to that issue, Ms. Morgan asked her if she was in agreement with the time-sharing plan as Ms. Morgan had summarized it. The former wife said she was in agreement and then asked about the "other holidays." Ms. Morgan explained that she would get her daughter one long weekend per month. The former wife expressed her satisfaction with that answer and then testified that no one had promised or threatened her to enter into the agreement—she was entering into it freely and voluntarily because she believed it was in the best interest of her daughter.

The former husband was then questioned by his attorney—Travis Johnson. The former husband confirmed that he had discussed the terms of the agreement with Mr. Johnson, who had answered all of his questions. He agreed that the time-sharing plan was in his daughter's best interest; that he had not been forced into the agreement or promised anything for his agreement; and that he had entered into it freely and voluntarily. Both parties confirmed they understood that the issues of the equitable distribution of assets and liabilities and other financial issues would be decided at a later date.

Nevertheless, three business days before the scheduled dissolution hearing, the former wife waivered and filed a pro se

Motion to Set Aside Custody Agreement, in which she alleged that she had been fearful and anxious and had felt pressured and coerced when she entered into the newly-stipulated time-sharing plan. On the heels of the motion, and based upon a Stipulated Motion to Withdraw, the trial court entered an order relieving Wanda Morgan of responsibility as the former wife's attorney of record.

On October 13, 2016, following a hearing, the trial court granted the former wife's Motion to Continue, in order that she could retain new counsel. The court also awarded the former husband fees and costs for the preparation necessary for the previously scheduled final hearing. In the meantime, the former wife—who did retain new counsel—filed Petitioner's Motion for Contempt, asking the trial court to find the former husband in contempt for failing to follow the January 7, 2016 Stipulated Temporary Order, as opposed to the terms of the September stipulated agreement.

**B.**

On January 20, 2017, a hearing was held before the court on the former wife's two motions. The former husband was present and represented by Mr. Johnson. The former wife was also present and represented by Tonya Holman. The trial court heard testimony from the former wife and Wanda Morgan.

According to the former wife—prior to the day that they met at the Mr. Johnson's law offices—Ms. Morgan had been telling the former wife that her "custody" case was weak because she worked and the former husband did not. She also referenced an email from Ms. Morgan sent on September 21, 2016, in which—in the former wife's words—Ms. Morgan told her that she might "lose [the case] . . . because [she] withheld very important information until just a couple of weeks before trial[.]"

Prior to admitting the email into evidence, the trial court informed the former wife that, by doing so, she was waiving her attorney-client privilege. The former wife said she understood. She then testified as to her version of the sequence of events that occurred on September 26, 2016, when she first arrived at the law offices for the deposition of her former husband.

4

As she described it, Ms. Morgan talked to her "quickly" outside, again advising her that her case was "weak" and that the judge "probably" would not give her custody because she worked. She then said, "So we opened the conversation" about a plan that would give the former husband majority time-sharing during the school year, but claimed that they "rushed into it." The former wife related that Ms. Morgan then spoke to Mr. Johnson and, afterwards, relayed back to her that he was willing to reduce her child support obligation to $200 per month during the months the former husband maintained majority time-sharing. The former wife said that she told the attorneys she could not afford even that amount, but Ms. Morgan allegedly responded that it was "the best deal" she could get "because the Judge may give some more."

At that point, Ms. Holman addressed the former wife's September 26 testimony where the former wife assented to the agreement. Specifically, the former wife argued that despite Ms. Morgan's representation that they had discussed the details of the time-sharing agreement, the former wife still harbored questions, but was too afraid to ask them; it was not what she wanted, but "everything happened so fast," she "wasn't ready," and she "wasn't given enough time to think about it."

The transcript of that meeting was moved into evidence. Ms. Holman went over each question asked by Ms. Morgan and answered by the former wife. She then asked the former wife how she felt when she answered those questions. The former wife testified that she felt "scared" and "confused," and did not know what was going on. In light of the email she received from Ms. Morgan, the former wife claimed she felt she was already losing her case.

The email conversation between the former wife and Ms. Morgan was entered into evidence. Read as a whole and in context, it revealed that on September 21, 2016, just days before the scheduled final hearing, the former wife advised Ms. Morgan of a new witness she had just thought of and asked Morgan if she would subpoena the witness. In response, Ms. Morgan informed the former wife that she had "severely hurt [her] case by not telling" her this "important information sooner." Ms. Morgan made clear that the former wife had been withholding information and

5

refusing to allow Morgan to request continuances. Ms. Morgan told her, "Your not allowing me to attempt to continue your case could cost you custody," and she explained that by the former wife's having withheld important information from her "until just a couple of weeks before trial" left her "no time to get witnesses and much needed information."

On cross-examination by Mr. Johnson, the former wife confirmed that it had been Ms. Morgan—and not the former husband—who had "forced" her into the agreement. She also admitted that after her deposition was taken on August 1, 2016, she and Ms. Morgan "consulted several times" on "the various strengths and weaknesses of the case." She then testified that things were "going so fast" during the negotiations on September 26, she could not "remember what was going on." Despite acknowledging that Ms. Morgan was negotiating terms that would have been beneficial to her, the former wife insisted she did not "want to do it."

When confronted with her sworn testimony that she had not been threatened into entering into the agreement, and when asked if she essentially had changed her mind upon arriving home, the former wife replied, "No," insisting she had never wanted the new time-sharing plan in the first place. She agreed with Mr. Johnson that divorce proceedings could be stressful and emotionally draining on anyone, but when asked if there had been anything beyond that "normal emotional strain of divorce that forced [her] to enter into this agreement," the former wife replied, "It was fast. I don't know."

Before Wanda Morgan testified, the trial court reiterated its earlier ruling that the former wife had affirmatively waived all privileged communications between her and Ms. Morgan.

Ms. Morgan testified that subsequent to the former wife's August 1 deposition, the two had conversed about what the deposition had revealed and how it might affect her case. During the deposition, it came to light that the former wife's work schedule as a nurse caused her to be "very reliant" on her mother to provide the necessary care for the parties' minor child. Ms. Morgan went on to relate that the week prior to the former husband's scheduled deposition, she received from the former wife some "pretty

6

accusatory and inflammatory" emails. Accordingly, when they both arrived for the former husband's deposition, Ms. Morgan asked the former wife to step outside to talk about the emails.

Ms. Morgan maintained that the email admitted into evidence was not representative of all the other emails that had passed between the two women. Rather, Ms. Morgan revealed that, in the other emails, she had discussed with the former wife all "the good, the bad, and the ugly" of the case, as she normally does with all her clients. One of those "ugly" facts was that the domestic violence charge the former wife had lodged against the former husband had been nol prossed. She also informed the former wife of all of the factors the trial court would weigh in determining "primary custody."

Returning to the conversation outside the law offices, Ms. Morgan testified that the former wife apologized about the earlier emails. She then told Ms. Morgan that she had been talking to her sister, who had previously given up custody of her child to her husband. Her sister told her that it was working out well and it would be in the best interests of the former wife's daughter if she spent the majority of her time with the former husband during the school year.

It was at that point—according to Morgan—that they began talking about a similar option for the former wife, and Ms. Morgan asked the former wife if she would want most of the summer with her daughter. The former wife said she would, and she also agreed to alternating visitation for Christmas and Thanksgiving. The former wife told Ms. Morgan that she was planning to return to school to become a nurse practitioner and was contemplating taking a job as a traveling nurse. For that reason, she agreed it would be in her child's best interest to be with the former husband for the school year. Ms. Morgan asked her if she wanted her to relay her preferences to Mr. Johnson, and the former wife said, "'Yes, that would be in her best interest.'" According to Ms. Morgan's recollection, it was the former wife who had approached her about giving the former husband majority time-sharing.

During the negotiations, however, the sticking point with the former wife was her support obligation. Ms. Morgan testified she explained to the former wife that she could not waive support, and

if they went before the trial court, it would impose a guidelines support amount. She then explained to the former wife that the former husband was agreeing to a "downward deviation" from the guidelines based on her agreeing to pay his transportation costs for visitation (the former husband was then living in Alabama). The guidelines monthly amount was close to $400, whereas the former husband was proposing the former wife pay only $200.

Ms. Morgan denied that the former wife at any time expressed confusion about the terms of the agreement. She asserted that she "made sure [the former wife] understood everything." Moreover, she agreed that it was not a complete settlement, as there were additional issues that would have to go before the court. Ms. Morgan went on to state:

> I have been doing this for fifteen years. I don't force anybody into anything. If she wanted her day in court, she could have gotten it. But she was the one who presented it to me. I presented it to you [Mr. Johnson]. We ironed out the details about the child's issues and put it on the record.

> And three or four hours later, she e-mailed me, and it wasn't about that she didn't want to agree to the custody anymore. She said, she couldn't afford to pay the $200 a month child support, that she was bringing in another family member from, I think, the Philippines. . . . [S]he had too many people to support already. She can't afford to pay $200, and I need you to set this aside.

> I said, "I'm sorry, ma'am. I can't in good faith file a motion to set aside because I don't feel I have the proper grounds for it. And over the course of the next couple of days, we went back and forth with e-mails. And I finally said, I have to withdraw as your attorney because I cannot ethically do what you're asking me to do.

On cross-examination, Ms. Morgan reiterated her testimony about the conversation outside in the parking lot, when the former wife announced she wanted to make the time-sharing offer to the former husband. Then she added:

And I was just like, really? I'm like, why? What are your reasons? We discussed the reasons. It's the 12-hour shifts at the hospital night and day. It's the traveling nurse job that she was anticipating getting. It's going to school to be a registered nurse practitioner, that she wasn't going to have time, and it wasn't fair to the child in that it would be best for her to be with her dad for the school year so that she could continue to go and make more money so that she could then – she has her mother over here. She's supporting her mom. So she could continue on to make more money to bring another family member. I think it was her dad, to come over.

Ms. Morgan repeated that it had been the former wife who brought up the subject; she wanted her to present it, and "kept saying over and over that it was in her daughter's best interest that she go live with dad for the school year," even though their plan all along had been to take it to trial. Ms. Morgan denied that she said their case was "weak," but just presented to the former wife what the court might do under the circumstances.

After hearing argument from counsel, the trial court recapped the evidence it had heard and then found:

> From the Court's perspective, the case was ongoing. It was litigious and contested. For a period of time, depositions had been taken. Conversations between [the former wife] and counsel, Ms. Morgan, had taken place.
>
> And [the former wife's] testimony is that on the date that [the former husband's] testimony was going to be taken at deposition, that she met with counsel. [The former husband] was to appear by telephone for his deposition.
>
> However, the deposition did not take place because negotiations ensued. The evidence presented in the form of [the former wife's] testimony is that under oath that day she answered many questions, and she was untruthful. That's her testimony today that she lied. So the reason, therefore, is the emotional tole [sic] that had

9

been taken upon her rendered her unable to truthfully testify as to whether or not she agreed and understood.

But the record is clear that she did agree and understand the terms of the agreement. In fact, Exhibit 1, the transcript, indicates the answers to those questions indicate that she did understand what she was doing, that she not been [sic] forced or coerced.

And the evidence today is all understood that in the event an agreement was not reached, that a final hearing was going to be conducted within weeks of that deposition and the date which the agreement that is sought to be set aside here was reached.

With respect to setting aside this agreement, because consistent with case law, *the Court is looking for the best interest of the child*. And to the extent that I think . . . the Court [sic] is *devoid of any evidence that would suggest the best interest of the child will not be served* by the agreement that was reached by the parties.

There is no evidence presented and none suggested that [the former husband], nor his counsel, coerced or manipulated or did anything untoward which resulted in [the former wife's] decision to enter into the agreement. That if there was duress, [the former wife's] testimony was that her counsel would have been the source of that duress.

Based on the best evidence before the Court, [the former husband] in no way, nor did his attorney, in any way, provide any coercion or any coercive activity. There's no legal evidence of that.

The motion to set aside the clearly-agreed upon custody arrangement is respectfully denied. Therefore, the motion or suggestion that by following the terms of the agreed-upon disposition that Mr. Vinson has acted in contempt of this Court cannot be well founded.

(Emphasis added.)

10

A written Order on Petitioner's Motion to Set Aside Agreement and Motion for Contempt was subsequently entered on January 27, 2017. Consistent with the trial court's oral findings, the order stated that the former wife was not coerced into entering into the stipulation and no evidence was presented to suggest the new time-sharing plan was not in the child's best interests. The day before, Ms. Holman, the former wife's attorney, was granted leave to withdraw as attorney of record based on an "impasse reached in the handling of the case."

On February 13, 2017, the "Parenting Plan of Mary Grace Vinson and Tommy Vinson for Final Judgment" was approved by the trial court. The plan memorialized in writing the parties' September 2016 stipulated agreement and granted majority time-sharing of the parties' daughter to the former husband during her school year. It was later incorporated into the Amended Final Judgment of Dissolution of Marriage.

## C.

The final hearing on the former wife's Petition for Dissolution of Marriage was held on October 30, 2017. The former wife appeared with new counsel, Michael Webster. The former husband continued to be represented by Travis Johnson. It was established early on in the former wife's testimony that there was no claim for alimony or spousal support, since she acknowledged that she had a higher income than the former husband at the time of the divorce proceedings. The evidence demonstrated that during the period of separation, the former wife did not contribute any portion of her wages or earnings to the former husband. She maintained separate accounts and accumulated separate assets during that time, but no funds were co-mingled.

Relative to the issues raised on cross-appeal, the evidence established that during the course of the marriage, the former husband had been employed by the U.S. Army Corps of Engineers. After he was fired from his position, he filed an administrative action alleging unlawful discrimination. The former husband prevailed before an administrative law judge and was awarded damages. The damages were divided into three discreet awards.

11

The first sum awarded was in the amount of $70,000. In a letter addressed to the Director of the Department of the Army dated June 20, 2017, the former husband's attorney who had handled the lawsuit—Adam J. Conti—referenced an enclosed copy of the "Final Agency Action," which ordered payment to the former husband of "nonpecuniary compensatory damages in the amount of $70,000." The compliance order from the office for Equal Employment Opportunity ("EEO") referenced a payment of $70,000, but did not specifically designate the award as one for "nonpecuniary compensatory damages." Later, in a letter from the Department of the Army dated July 14, 2017, in response to Mr. Conti's letter, it was again noted that a check in the amount of $70,000, dated December 23, 2016, was issued to the former husband.

At the final hearing, one of the issues for the trial court to resolve was how to characterize the $70,000 for purposes of equitable distribution. During the former wife's direct examination, Mr. Webster referred to the damages as "nonpecuniary" when he was reading from Mr. Conti's letter. On cross-examination of the former wife by Mr. Johnson, the following questions and answers transpired:

Q. [by Mr. Johnson] Now let's talk about the time periods and frames as what we have at issue here. First of all, isn't it true, ma'am, that nonpecuniary means non-money?

A. I don't know.

Q. Okay. If I told you that nonpecuniary meant that it was not related to a money quantifiable amount, what would that mean to you?

A. I don't understand.

Q. If nonpecuniary meant it is not calculable by money, what does that mean to you?

A. It is an asset.

12

Q. And that asset – was the nonpecuniary compensatory damages paid to Mr. Vinson as a result of essentially an unlawful firing claim, right, an employment discrimination claim?

A. I don't know what it is all for.

The trial court put an end to this fruitless interrogation by tersely interjecting: "Mr. Johnson, I know what it means."

In his direct examination, the former husband explained that he had filed a discrimination claim, had gone to trial, eschewing a settlement offer, and was awarded "damages." Over Mr. Webster's objection, the former husband was permitted to testify that the $70,000 award was "nonpecuniary" "for stress, for health issues, and for putting [him] in a bind financially." He said, "The . . . federal judge awarded me that money for me for what I had been put through by my Army Corp [sic] of Engineers boss."

The second element of damages awarded in the federal administrative lawsuit was back pay in the gross amount of $112,618.72. However, according to the former husband, his actual payout was the "net amount" of $71,082.85, as acknowledged by the Department of the Army's July 14, 2017 letter to Mr. Conti.

During her testimony, the former wife and her attorney set about to determine whether the net amount was legitimate. Through his questioning of the former wife, Mr. Webster established that if the former husband, in fact, had netted only $71,082.85, then around $40,000 was withheld from the $112,618 gross award for "some reason" that could not be explained in terms of typical federal withholding. The former wife testified that she and Mr. Webster ran the amount through a computer software program known as "FinPlan" to calculate "federal income taxes, Social Security, and Medicare to determine the correct amount of withholding." Utilizing the FinPlan calculations, and taking into account head-of-household and child exemptions, the former wife claimed that the correct amount of back pay the former husband should have received was $83,844, not $71,082.85. The former husband objected to the calculation on the basis it was hearsay and speculative, but his objection was overruled.

13

For his part, the former husband insisted that he received a check for only $71,082 from the $112,618 awarded. He claimed he had no control over what amounts were withheld. Furthermore, in calculating the marital portion of the $71,082, he excluded the months of June 2015 through October 2015. According to the former husband, those months were post-filing and, therefore, the portion of the award amortized over those months would be non-marital. He likewise excluded the months from January 2015 to June 2015, when the parties were separated. His figure for the marital portion of back pay was $35,541. The former husband explained his request for an unequal distribution of those portions of the back pay that accrued after the parties had separated on the following grounds: "We were living separately, we had our own separate incomes, we were not paying each other's bills, [and] we had no association whatsoever."

The third component of the administrative damages award was the former husband's front pay from November 2016 through April 1, 2017. The former wife agreed that it was a non-marital asset.

Also during the marriage, the former husband had a "BB&T account." The former wife agreed that the account was solely in her husband's name. It was established that on April 12, 2010, $32,962.97 was deposited into the account. A second deposit of $31,728.37 was deposited on May 7, 2015. The former husband testified at length about the circumstances under which he attained the money in the account. He explained that the investment account was opened prior to his mother's death and that he and his brother had invested money for her in the account. He further testified that the funds were used strictly for his mother's benefit until they passed to him and his brother upon her death. He testified that the funds had been gifted to him by his mother and were never co-mingled with marital funds. Furthermore, no contributions had been made to the account during the marriage. In her pre-trial deposition, the former wife acknowledged that she considered the account to be non-marital property.

Next, the former husband testified that he had made 100 percent of the mortgage payments on the marital home following

the parties' separation and prior to entry of the final judgment. The pay down on the principal of the mortgage was due solely to his payments. He claimed that the amount of equity created during that period totaled $4,903.32 in his favor.

While exercising equal time-sharing of their daughter prior to the September 2016 agreement, the parties had agreed to rotate the child dependency tax exemption. Nevertheless, the former wife claimed the exemption two years in a row. In 2016, the child resided primarily with the former husband, but the former wife claimed her as an exemption in both 2015 and 2016. Consequently, the former husband testified to losing $1615.

In her direct examination, the former wife testified she "was suggesting that each [party] maintain $100,000 worth of life insurance on [their] respective lives naming the other party as beneficiary." The former husband made a similar plea in his counter-petition for dissolution of marriage. The only other evidence relevant to the insurance issue established that the former husband was sixty-four years old.

**D.**

In its Final Judgment of Dissolution of Marriage, the trial court ordered the parties to share parental responsibility for their daughter "per the terms of the Parenting Plan of Mary Grace Vinson and Tommy Vinson for Final Judgment previously entered in this action on February 13, 2017." It required that both parties maintain life insurance policies of at least $100,000, naming the other party as the sole beneficiary "in trust for the parties' minor child." The trial court adopted the former wife's date of filing her petition as the cut-off date for designating the parties' assets and liabilities as marital or non-marital for purposes of equitable distribution, according to section 61.075(7), Florida Statutes.

The marital assets were identified in a table entitled "Marital Assets," which contained two columns describing the assets and their values and, next, a column each for the former husband and the former wife in which the trial court indicated the marital asset (or liability). In the column regarding the former husband's receipt of back pay, the trial court arrived at the net amount as follows: "$112,618.72 gross. Net $71,082.85. Received by H on May 24,

15

2017. 74.1% MARITAL. Covers time frame of 3/22/14-10/31/15. Deductions way too high." Accordingly, the parties each received in their respective columns a net value of the back pay in the amount of $83,844, as calculated by the former wife. The full $70,000 of the alleged "nonpecuniary compensatory damages" was placed in the former husband's column, indicating that the trial court found it to be a marital asset.

Following the table, the trial court set forth line-item explanations. Regarding the back pay calculation, the trial court explained its findings as follows:

> As to the "Back Pay" component, Wife's Exhibit 18, properly calculates that the parties were married to each other (up until the date of filing) for 435 days and with this claim component spanning a period of 587 days. The Wife properly calculated that 74.1% of this component is "marital." That percentage equates to $83,844 of the gross distribution.

> When the "Back Pay" settlement was paid to Husband, $41,536 was deducted. The Husband provided to the court no itemization of what those deductions were for. In Wife's Exhibit 20, the FinPlan calculations state that after deducting Federal Income Taxes, Social Security, and Medicare contributions, the Husband's true "net" pay is slightly more than 80% of the gross distribution. So, the court accepts as accurate the Wife's use of $16,768 deduction which is 20% of the gross marital portion of this claim.

Regarding the $70,000, earmarked as "nonpecuniary compensatory damages" by the former husband, the trial court commented:

> This is the "nonpecuniary compensatory damages" of $70,000 pertaining to the Army Corps of Engineers claims. Both parties have cited the *Weisfeld*[*] case which states that "non economic compensatory damages for

---

[*] *Weisfeld v. Weisfeld*, 545 So. 2d 1341 (Fla. 1989).

16

pain and suffering" are to be classified as the injured party's non-marital asset. There is no evidence as to this portion of the claim being even labeled for any genuine "pain and suffering." In the absence of any document whatsoever which states these damages are for "pain and suffering" then the court finds this asset accrued during the marriage is properly classified as a marital asset.

The trial court next turned to the former husband's BB&T account. It found that the former husband "met his burden of showing the nature of the monetary asset being non-marital." Therefore, that asset, valued at $64,691, was not included in the equitable distribution table under marital assets.

Lastly, in an effort to assure that all marital assets and liabilities were equally divided between the parties, the trial court ordered the former husband to pay to the former wife an "equalization payment" of $80,596. The trial court specifically noted that the former husband "testified that he has uncashed checks in his safe totaling that amount or more." Nevertheless, the trial court ordered that the equalization payment be reduced by $2400, the amount the court found equaled the amount of child support the former wife should have paid to the former husband for the twelve months preceding the final hearing, in accordance with the September 2016 stipulation.

Additionally, the trial court found that the former husband "has the uncontroverted better ability to pay the Wife's attorney's fees and court costs . . . ." However, it went on to state that the former wife owed the former husband "unspecified attorney's fees and costs associated with the Wife's first sought and obtained continuance herein." On the other hand, it further noted that the former wife "later had to incur attorney's fees and costs associated with successful [sic] Motion to Compel." To resolve the competing claims, the trial court awarded to the former wife 50% of her fees and costs incurred in the dissolution proceeding and retained jurisdiction to ascertain the amount of said fees and costs.

As made abundantly clear by the instant appeal and cross-appeal, both parties claim error from the trial court's decisions in this litigation and in its findings of fact and conclusions of law

17

contained in the final judgment. In the following sections, we will address their points of alleged error in turn.

## II. FORMER WIFE'S APPEAL

### A. The stipulated time-sharing agreement and the trial court's parenting plan.

In her first and second points on appeal—combined for purposes of her Initial Brief—the former wife contends that the trial court erred in failing to set forth in its "Parenting Plan of Mary Grace Vinson and Tommy Vinson for Final Judgment" the specific factual findings concerning the best interests of the child as enumerated in section 61.13(3), Florida Statutes. Specifically, the factors the former wife claims should have been considered are those set forth in section 61.13(3)(m) and (s) regarding, respectively, evidence of domestic violence and the developmental stages and needs of the parties' minor child. She further argues that the trial court improperly considered itself bound by the parties' September 2016 time-sharing agreement, thereby improperly abdicating its responsibility to make specific findings as to the best interests of the parties' minor child regarding child support, custody, and visitation.

"It is well settled that a trial court has broad discretion in child custody matters; its decision in that regard is reviewed for a clear showing of an abuse of discretion." *Adair v. Adair*, 720 So. 2d 316, 317 (Fla. 4th DCA 1998). Moreover, although section 61.13(3) does indeed set forth a lengthy list of factors concerning the best interests of the child that the trial court should evaluate in determining issues of shared parental responsibility, "there is no statutory requirement that the trial court make specific written findings in a custody decision." *Id.*; *accord Neville v. McKibben*, 227 So. 3d 1270, 1273 (Fla. 1st DCA 2017); *Hindle v. Fuith*, 33 So. 3d 782, 785 (Fla. 5th DCA 2010) ("Thus, a final judgment is not erroneous simply for failing to list the factors on which it relied in making its determination."); *Miller v. Miller*, 842 So. 2d 168, 169 (Fla. 1st DCA 2003). "However, the trial court must find, at a minimum, that its custody determination is in the best interests of the child." *Neville*, 227 So. 3d at 1273; *but see Fazzaro v. Fazarro*, 110 So. 3d 49, 51 (Fla. 2d DCA 2013) (holding there was no logic or

justification for the trial court's decision to grant one party ultimate responsibility over all decisions affecting the child).

To the extent that the former wife seeks reversal based on the trial court's failure to make specific findings under section 61.13(3), we hold that she waived that claim by failing to apprise the trial court of the point in a motion for rehearing, so that the court could have addressed the matter while the facts were still fresh and easily recollected. *Frost v. Frost*, 227 So. 3d 227, 227 (Fla. 1st DCA 2017); *Freiha v. Freiha*, 197 So. 3d 606, 608 (Fla. 1st DCA 2016); *Welch v. Welch*, 22 So. 3d 153, 155-56 (Fla. 1st DCA 2009); *Helling v. Bartok*, 987 So. 2d 713, 715 n.1 (Fla. 1st DCA 2008) (citing cases). Nor do we find that she has demonstrated fundamental error. *Cf. Freiha*, 197 So. 3d at 609. As we did in *Frost*, we find this case distinguishable from *Freiha*, which involved a total failure on the trial court's part to address the focal issue of the litigation, that being the need for a parenting plan that included a detailed time-sharing schedule. Here, in contrast, the trial court heard lengthy testimony concerning the parties' revised time-sharing plan, determined that the parties had entered into the plan voluntarily and without coercion, and further found that the plan was in the child's best interests.

However, the former wife makes the additional claim that the trial court abdicated its authority to consider the best interests of the child to the parties by adopting their September 2016 time-sharing agreement. Although the former wife did not raise this alleged error in a motion for rehearing, insofar as section 61.13(2)(c), Florida Statutes, mandates that the trial court "shall determine all matters relating to parenting and time-sharing of each minor child of the parties in accordance with the best interests of the child," whether a trial court abdicates that authority takes on fundamental proportions. Accordingly, we will consider the point under the instant facts for fundamental error. The former wife's argument under this point is predicated on the well-established law expressed in *Higgins v. Higgins*, 945 So. 2d 593 (Fla. 2d DCA 2006), and *Lane v. Lane*, 599 So. 2d 218 (Fla. 4th DCA 1992). We discuss the cases in reverse order below.

First, it is clear that Florida courts respect separation agreements as long as they are fair "and are not tainted by fraud,

overreaching or concealment." *Sedell v. Sedell*, 100 So. 2d 639, 642 (Fla. 1st DCA 1958). But, "[t]he 'best interests' of the child takes predominance over any agreement between the parents and must be independently determined by the trial court." *Puglisi v. Puglisi*, 135 So. 3d 1146, 1148 (Fla. 5th DCA 2014). As the Fourth District ruled in *Lane*, "a trial court's responsibility to the child cannot be abdicated to any parent [or to] any expert[.]" 599 So. 2d at 219. Rather, "[t]hat heavy responsibility mandates that a court is not bound by any agreement between parents, nor by the opinions of any expert or group of experts." *Id.*

*Lane* involved an appeal by the father of a final judgment limiting his telephone contact with his son, restricting his visitation to "supervised," and domesticating a Michigan divorce decree that granted "reasonable" visitation. The father and mother had earlier agreed at mediation to be bound by a psychologist's opinion concerning whether visitation should be supervised or unsupervised. Both that psychologist, as well as a second psychologist—who did not interview the child—favored unsupervised visitation. No hearing was held on the matter. Instead, in entering its judgment, the trial court considered only those printed reports, the father's pre-dissolution Michigan convictions, and "a novel time saver of some 14 pages of a 'proffer' [] stating the position of each parent." *Id.* The Fourth District reversed the trial court's judgment. It held that the "rationale" for the above-stated rule that "a court is not bound by any agreement between parents, nor by the opinions of any expert or group of experts,"

> is the ability of the trial judge to observe the demeanor and personalities of the parties and witnesses, to discern delicate vibrations and hidden influences, and to interpret nuances that are invisible in a cold record. Custody and visitation are too important to both the child and parents to restrict a determination to a reading of unemotional and dispassionate words on a printed page.

*Id.* In short, the trial court in *Lane* should have held a hearing to determine the best interests of the child.

While *Higgins* involved a different factual scenario, the facts are no less compelling than those in *Lane*. In *Higgins*, the husband,

20

the wife, and the trial court engaged in ex parte letter writing between the three in an attempt to resolve the issue of the wife's failure to abide by the terms of the parties' settlement agreement—which had been incorporated in the final judgment of dissolution—as well as the wife's announced intention to move with the parties' son to North Florida. At a hearing, where the parties appeared pro se, the judge held the wife in contempt, ordered her to be incarcerated, and modified child custody. Later in the day, the judge released the wife, brought the parties back into court, and ordered them to proceed to mediation. Still later, the judge signed what the Second District described as "an odd document" entitled "'Order,'" indicating at the bottom that it was "so ordered" by the judge, though it was clear from the body of the order that it was an agreement entered into by the parties. The order transferred official custody of the minor child to the husband. *Higgins*, 945 So. 2d at 595.

On appeal, the wife challenged the order on the basis that there had been no petition for such relief filed and modification had been outside the scope of the hearing. The Second District held that "the order would be reversible for those reasons if it was intended to reflect the judge's determination that the best interests of the parties' child warranted a custody modification." *Id.* Instead, it adopted the husband's view that the order "simply incorporated and approved the terms of the mediation agreement signed by the parties." *Id.* The Second District went on to consider the record before it and discerned the following problems:

> The record amply demonstrates that the circuit judge did not guard against the strong possibility that Ms. Higgins agreed to surrender custody of her son for reasons other than the child's best interests. To the contrary, the record shows that she did so under highly coercive circumstances that were devised by the judge himself. With no prior notice and no counsel, this woman was ordered directly to mediation by the very judge who had just summarily held her in criminal contempt and placed her in custody to serve a six month jail sentence. Moreover, one of the judge's stated reasons for the contempt conviction was his announced determination that Ms. Higgins's attempt to relocate with the child was

barred by court order and therefore was unlawful. As previously noted, this was simply untrue. Thus, in addition to the foregoing, the judge sent this woman into mediation after seriously misadvising her about her rights.

*Id.* at 596-97 (footnote omitted). Hence, the Second District concluded that the trial court abused its discretion, explaining:

> Whether the judge in this case approved a hastily drafted agreement, or whether he ordered a change of custody without taking evidence, no reasonable person with knowledge of the facts of this case would not question the propriety of his decision. . . . No reasonable judge, apprised of the highly coercive circumstances under which this child custody agreement was made, would have approved it.

*Id.* at 597 (citations omitted). Again, as occurred in *Lane*, the judge in *Higgins* failed to personally take testimony to ascertain the best interests of the child.

Although not cited by the former wife, this Court addressed these same concerns in *Sparks v. Sparks*, 75 So. 3d 861 (Fla. 1st DCA 2011). In *Sparks*, the parties entered into a pro se marital settlement agreement in which they agreed upon the joint custody of their minor child and set forth a schedule of rotating physical custody. The father then filed a pro se petition for dissolution of marriage in which he sought sole custody of the child, without mentioning the agreement. In her answer and counter-petition, the mother alleged that custody and visitation should be awarded pursuant to the agreement and, on those grounds, moved for a partial summary judgment on the issue of custody. This Court emphasized the rule that "'a trial court is not bound by any agreement between parents, nor by the opinions of any experts or group of experts.'" *Sparks*, 75 So. 3d at 862. (quoting *Lane*, 599 So. 2d at 219). We next noted:

> The trial court denied the motion for partial summary judgment and reserved "the right to evaluate a previously executed marital settlement agreement to determine if said agreement is in the best interests of the minor child,

which is to be determined after an evidentiary hearing." At the subsequent hearing, however, the trial court announced, over the objection of the father, that it was limiting its inquiry to the issues of whether the settlement agreement was a product of fraud or duress and whether the custody and visitation provisions of the agreement were facially unreasonable. Because the father had not formally moved to set aside the marital settlement agreement, the father would be bound by that agreement absent a finding of fraud, duress or unreasonableness. Finding none of these things, the trial court incorporated the marital settlement agreement in its amended final judgment. It also adopted the parenting plan submitted by the mother, a plan which, contrary to the agreement, did not allow for liberal rotation of physical custody.

*Id.* at 861-62. We reversed the trial court's decision because the court would not permit the father to present evidence as to whether an award of custody pursuant to the agreement was in the best interests of the child, explaining:

By his dissolution petition and his affidavit in opposition to partial summary judgment, the father clearly advised the trial court that he sought a custody award without regard to the previous settlement agreement. Further, in his affidavit the father asserted that shared custody of the child with the mother was certainly not in the best interest of the child given certain averments. Because section 61.13(2)(c)[, Florida Statutes] requires a trial court to determine all parenting issues in accordance with the best interests of the child, and because the father asserted below that the child custody and visitation provisions of the settlement agreement are not in the best interests of the child, the trial court erred in denying an evidentiary hearing on the issues of custody and visitation.

*Id.* at 862.

In the present case, we find the facts differ from those in *Sparks, Higgins, and Lane.* Here, in contrast to *Sparks*, the trial

23

court did not deny the former wife a hearing on her motion to set aside the settlement agreement and to present evidence of the best interests of the child. Neither did the trial court orchestrate the proceedings so as to deny the former wife her due process rights, as did the trial court in *Higgins*. Finally, the trial court did not base its decision to adopt the parties' time-sharing plan on a cold record, as did the trial court in *Lane*. Instead, the court held a hearing and heard testimony from the former wife, who was represented by counsel, as well as testimony from the former wife's first attorney, who originally assisted the parties in reaching the agreement.

As a result, the trial court was in a better position than we are now "to discern delicate vibrations and hidden influences, and to interpret nuances" in the testimony. *Lane*, 599 So. 2d at 219. The record supports the conclusion that the trial court considered the credibility of the witnesses, rather than deferring that responsibility to this Court, an additional, pivotal point in *Lane*. *Id*. ("Nor can this court substitute its opinion for that of the trier of fact."). Moreover, the parties were certainly not strangers to stipulated agreements, as evidenced by the January 16, 2016 Stipulated Temporary Order.

Therefore, we conclude that the former wife has not carried her burden of demonstrating that the trial court "abdicated" its duty to determine the best interests of the child in adopting the parties' parenting plan. The court's decision to do so—following an evidentiary hearing—was based on competent, substantial evidence. Accordingly, under the circumstances of this case, we hold the trial court did not fundamentally err in denying the former wife's motion to set aside the time-sharing plan in formally adopting it, and incorporating it into the final judgment.

## B. The trial court's denial of the former wife's motion for contempt.

Under what is the former wife's third point, she argues that the trial court should have found that the former husband was in contempt of court by not paying child support in accordance with the January 7, 2016 Stipulated Temporary Order, since the court had not formally adopted the September 26, 2016 parenting plan as required by section 61.046(14)(a)1., Florida Statutes. We

24

conclude the trial court did not abuse its discretion in denying the former wife's motion. The court evaluated the evidence, the most prominent being the intervening September 2016 parenting plan agreement—by which the former husband had abided—and properly found it sufficient to support its finding that the former husband's failure to pay the monthly support due under the January 2016 order was not willful. *See Bowen v. Bowen*, 471 So. 2d 1274, 1278-79 (Fla. 1985). Consequently, we hold that the former wife has failed to demonstrate reversible error under this point.

## III. FORMER HUSBAND'S CROSS-APPEAL

### A. "Non-pecuniary compensatory damages" as a marital asset.

Identification of an asset as marital or non-marital for purposes of equitable distribution is reviewed de novo. *Puskar v. Puskar*, 29 So. 3d 1201 (Fla. 1st DCA 2010).

> When a trial court makes an equitable distribution award, it must provide specific factual findings that identify and distinguish the marital assets from the non-marital assets. See § 61.075(3)[, Florida Statutes] (requiring that "any distribution of marital assets or marital liabilities shall be supported by factual findings in the judgment or order based on competent substantial evidence").

*Smith v. Smith*, 996 So. 2d 924, 925 (Fla. 1st DCA 2008). In Florida, when a trial court is called upon to determine the marital or nonmarital status of a monetary award received by a spouse as damages stemming from a lawsuit, a workers' compensation claim, or from disability, it must utilize the "analytical approach" adopted by the Florida Supreme Court in *Weisfeld v. Weisfeld*, 545 So. 2d 1341, 1346 (Fla. 1989). Under that approach,

> the damage award is allocated in accordance with the following: (a) the *separate property* of the injured spouse includes the *noneconomic compensatory* damages *for pain, suffering, disability, and loss of ability to lead a normal life* and the economic damages which occur

25

subsequent to the termination of the marriage of the parties, including the amount of the award for loss of future wages and future medical expenses; (b) the separate property of the noninjured spouse includes loss of consortium; and (c) the *marital property* subject to distribution includes the amount of the award for lost wages or lost earning capacity during the marriage of the parties and medical expenses paid out of marital funds during the marriage. *The marital property should also include those funds for which no allocation can be made.*

*Id.* at 1345 (emphasis added) (relying on the principles set forth in *Johnson v. Johnson*, 346 S.E.2d 430 (1986)). In adopting this approach, the supreme court advised: "[A]pplication of this approach requires an understanding by the trial judge of the purpose of the damage award." *Id.* at 1346. That observation reiterates a declaration made by the Third District Court of Appeal in *Weisfeld v. Weisfeld*, 513 So. 2d 1278 (Fla. 3d DCA 1987), and quoted by the supreme court in its opinion affirming the Third District's decision: "[T]he trial court's inquiry should focus 'on the elements of damages the particular award was intended to remedy or, stated another way, the purpose of the award . . . .'" *Weisfeld* 545 So. 2d at 1343-44 (quoting *Weisfeld*, 513 So. 2d at 1281).

In the present case, in its equitable distribution table, the trial court placed all of the $70,000 award in the husband's column, thereby denominating it as a marital asset on the basis of the letter from his attorney, Adam J. Conti, to the Department of the Army, and the two letters he received in response. But that decision misperceived the evidence. In Conti's letter, the $70,000 was designated as "nonpecuniary compensatory damages," while the remainder of the award was itemized as back pay, front pay, and attorney's fees. In neither of the letters from the Department of the Army was the $70,000 designated "nonpecuniary compensatory damages" or as any other form of specific damages. Instead, it was treated simply as a separate recovery within "the Army's Final Decision for implementation concerning the subject EEO complaint[.]" (The administrative decision, itself, was not presented in evidence.)

As stated above, after the equitable distribution table, the trial court set forth specific findings explaining its distribution decisions. To recap, concerning the $70,000, the court declared:

> This is the "nonpecuniary compensatory damages" of $70,000 pertaining to the Army Corps of Engineers claim. Both parties have cited the *Weisfeld* case which states that "non economic compensatory damages for pain and suffering" are to be classified as the injured party's non-marital asset. There is no evidence as to this portion of the claim being even labeled for any genuine "pain and suffering." In the absence of any document whatsoever which states these damages are for "pain and suffering" then the court finds this asset accrued during the marriage is properly classified as a marital asset.

The court then went on to find that the former wife had made no claim to any portion of the former husband's award of front pay.

It is clear from the forgoing that the trial court attempted to apply the analytical approach from *Weisfeld* in seeking to denominate the $70,000 damage award as marital. There is, in the former husband's argument, a striking oxymoron created by describing a monetary value of $70,000 as "nonpecuniary." "Nonpecuniary" is defined as "not consisting of money." *See* "Nonpecuniary," *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/nonpecuniary (last viewed Aug. 29, 2018).

Notwithstanding the incongruous terminology, it is clear from the context of the questioning that the parties and the trial court utilized the term "nonpecuniary" with the intent to mean "noneconomic," as that term was used in *Weisfeld*. Although the three letters admitted into evidence do not explicitly specify that the $70,000 was awarded to compensate the former husband for any noneconomic pain and suffering he might have endured as a result of the alleged harassment during his employment and his subsequent firing, the former husband testified that that is precisely what the $70,000 was intended to compensate him for. And, because the former husband's testimony went unrebutted and was consistent with Mr. Conti's allocation of the $70,000 portion of the award as "compensatory," it was sufficient to

establish that the $70,000 was the former husband's separate property, not subject to equitable distribution as a marital asset. *White v. White*, 705 So. 2d 123, 124 (Fla. 2d DCA 1998) (holding that where the "[t]he only testimony regarding the purpose of the award came from the husband," "[t]he unrebutted evidence established that the personal injury award was the husband's separate property, not subject to equitable distribution"); *accord Gibbons v. Gibbons*, 10 So. 3d 127, 132-33 (Fla. 2d DCA 2009); *Lacher v. Lacher*, 993 P.2d 413 (Alaska 1999). Accordingly, we hold the trial court erred in designating the $70,000 as a marital asset.

## B. The trial court's adoption of the former wife's equitable distribution scheme.

Under this point, the former husband challenges (1) the trial court's unequal distribution of the marital assets; (2) its failure to award him sole ownership of the lawnmower, a Coke machine, and a gumball machine located in the former wife's house, which the former wife agreed below belonged to him; (3) the trial court's decision to adopt the former wife's valuation of the net back-pay awarded the former husband, which was accomplished through use of the FinPlan software program; and, (4) the trial court's decision to order the former husband to make a lump sum equalization payment of $80,596 to the former wife.

Due to our decision to reverse the equitable distribution to the extent that the trial court misclassified the $70,000 as a marital asset—which necessarily affects the overall plan for equitable distribution of the marital property—we are compelled to vacate the entire equitable distribution scheme and remand the cause for the trial court to reconsider equitable distribution consistent with this decision, in order to do equity and justice to both parties. *Young v. Young*, 606 So. 2d 1267, 1270 (Fla. 1st DCA 1992); *Sweeney v. Sweeney*, 583 So. 2d 398, 399 (Fla. 1st DCA 1991). However, our resolution of the former husband's remaining points on cross-appeal should be instructive to the trial court on remand.

First, the trial court must reconsider its valuation of the former husband's award of back pay. The only competent evidence of record is the former husband's testimony that he received $71,082 out of the $112,618 awarded him in back pay. *See White*, 705 So. 2d at 124. That figure was consonant with the amount set

forth in the husband's exhibits—the letters from the Department of the Army. The trial court's rejection of that figure in favor of the former wife's FinPlan software calculation of $83,844 was based on speculation and not on any other competent, substantial evidence presented by the former wife disputing the former husband's testimony. Therefore, the trial court abused its discretion in utilizing the $83,844 number. On remand, the court should use the figure of $71,082 in determining the value of that marital asset.

We also agree with the former husband that the trial court erred when it provided that if the former husband failed to pay the lump sum equalization payment within ten days of the entry of the final judgment, the amount due would be reclassified as alimony. First, at the outset of the hearing, the former wife, through counsel, advised the trial court that there would be "no claim for alimony." Second, once reclassified, the so-called alimony payments were expressly ordered "not [to] terminate upon the Wife's death or remarriage and shall not be subject to termination or modification in the event the Wife enters into a supportive relationship." The latter language is wholly at odds with the definitions of the various forms of alimony authorized by section 61.08(5)-(8), Florida Statutes, all of which provide that the alimony shall end upon the death or remarriage of the receiving spouse.

Furthermore, as the former husband points out, a lump sum payment award that effects a property distribution is not enforceable by contempt, as are alimony awards. *Bongiorno v. Yule*, 920 So. 2d 1209, 1210 (Fla. 1st DCA 2006); *see also Braswell v. Braswell*, 881 So. 2d 1193, 1198 (Fla. 3d DCA 2004). Accordingly, on remand, in reconsidering the equitable distribution scheme, the trial court should not reclassify any equalization payments as alimony as a sanction for the former husband's failure to make that lump sum payment.

Lastly, because the former wife agreed that the former husband is entitled to sole ownership of the lawnmower, the Coke machine, and the gumball machine, the trial court is instructed on remand to award those specific items to the former husband.

We dismiss as unfounded, however, the former husband's claim that the trial court abused its discretion in failing to order

an unequal distribution of $17,770.50, representing that portion of the back pay—which was otherwise held to be a marital asset—that accrued during the period of time between December 28, 2014, to June 1, 2015 (the date of filing), when the parties were separated. The decisions relied on by the former husband—*Moon v. Moon*, 594 So. 2d 819 (Fla. 1st DCA 1992); *Krafchuk v. Krafchuk*, 804 So. 2d 376 (Fla. 4th DCA 2001); and *Heslop v. Moore*, 716 So. 2d 276 (Fla. 3d DCA 1998)—represent extreme factual scenarios and substantial periods of separation not equaled in the present case. *See Boyle v. Boyle*, 30 So. 3d 665, 666-67 (Fla. 5th DCA 2010).

Moreover, as recognized in *Boyle*, the statute in *Moon* does not comport with the language of the current statute. *Id.* at 666 n.1. In the present case, the separation was a mere five months, and no compelling evidence was submitted that would shift the equities in favor of the former husband during the separation. The former husband clearly has more liquid assets than does the wife. It is submitted, therefore, that the trial court did not abuse its discretion in not making an unequal distribution of the assets during the period of separation. *See Cooley v. Cooley*, 43 Fla. L. Weekly D1965, D1967 (Fla. 2d DCA Aug. 24, 2018) (reversing the trial court's decision to make an unequal distribution; distinguishing *Heslop* and *Boyle*, and concluding "there was no need for an unequal distribution based on the parties living separate lives," observing that "the parties were married for eight years and separated after four years," "[t]he petition for dissolution was filed less than two years after the separation date," and the parties "agreed to use the date of separation for identifying and valuing nearly all of the marital assets and liabilities" except for the marital home).

### C. The trial court's ordering the former husband to maintain a policy of life insurance and to pay the former wife's attorney's fees.

In its final judgment, the trial court ordered both parties to "keep in full force and effect" life insurance policies of at least $100,000, naming the other party as beneficiary of such policy "in trust for the parties' minor child," "for so long as either party has an obligation to pay child support." Notably, in his counter-petition for dissolution of marriage, the former husband pleaded "that both

parties be required to maintain life insurance on his or her life as security for child support, with the other party designated as the beneficiary of same in trust for the use and benefit of the parties' minor child, on both a temporary and permanent basis." Having requested what the trial court ultimately ordered, we conclude the former husband has waived any objection to the trial court's granting of that request. Furthermore, to the extent the former husband challenges a lack of findings regarding the need and ability to pay for a life insurance policy, those omissions should have been brought first to the trial court's attention in a motion for rehearing, which it was not. *See Anaya v. Anaya*, 987 So. 2d 806, 807 (Fla. 5th DCA 2008) (Mem.) (citations omitted) ("A party may not complain about 'inadequate findings in a dissolution case unless the alleged defect was brought to the trial court's attention in a motion for rehearing.'").

For the same reason, because the former husband's failure to raise in a motion for rehearing the trial court's lack of findings as to the former wife's need for her attorney's fees to be paid, and the former husband's ability to pay the fees, the issue of the court's failure to make those findings was not preserved for review. A party will not be heard to complain of an absence of factual findings for the first time on appeal. *Brock v. Brock*, 229 So. 3d 425 (Fla. 1st DCA 2017) (Mem.); *Byers v. Byers*, 149 So. 3d 161, 161–62 (Fla. 1st DCA 2014); *Furr v. Furr*, 57 So. 3d 914, 914 (Fla. 1st DCA 2011) (Mem.); *Mize v. Mize*, 45 So. 3d 49, 49 & n.1 (Fla. 1st DCA 2010); *Welch*, 22 So. 3d at 155–56; *Simmons v. Simmons*, 979 So. 2d 1063, 1064 (Fla. 1st DCA 2008); *Owens v. Owens*, 973 So. 2d 1169, 1169 (Fla. 1st DCA 2007).

## IV. CONCLUSION

For the reasons stated above, the Final Judgment of Dissolution of Marriage is affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this opinion.

AFFIRMED, in part, REVERSED, in part, and REMANDED with instructions.

MAKAR and OSTERHAUS, JJ., concur.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

Mary Grace Vinson, pro se, Appellant/Cross-Appellee.

Travis R. Johnson of Meador & Johnson, P.A., Pensacola, for Appellee/Cross-Appellant.